**In the Matter of the Grand Jury Subpoena Addressed to First National City Bank.**

**UNITED STATES of America, Petitioner-Respondent,**

v.

**FIRST NATIONAL CITY BANK and William T. Loveland, Respondents-Appellants.**

**Nos. 557, 558, Dockets 32404, 32405.**

United States Court of Appeals
Second Circuit.

Argued June 12, 1968.

Decided June 26, 1968.

Henry Harfield, New York City (Shearman & Sterling, Michael J. Aratingi, New York City, of counsel), for respondents-appellants.

Carl W. Schwarz, Atty., Dept. of Justice, Washington, D. C., (Edwin M. Zimmerman, Acting Asst. Atty. Gen., Howard E. Shapiro, David S. J. Brown, Ernest S. Carsten, Attys., Dept. of Justice, of counsel), for petitioner-appellee.

Briefs of amicus curiae urging reversal were filed by Sullivan & Cromwell, New York City (William C. Pierce, New York City, of counsel), for The New York Clearing House Association, Bank of America National Trust and Savings Association, Brown Brothers Harriman & Co., The First National Bank of Boston, The First National Bank of Chicago; and Kelley, Drye, Newhall, Maginnes & Warren, New York City (Francis S. Bensel, Albert J. Walker, Richard J. Concannon, New York City, Brown & Platt, Chicago, Ill., of counsel), for Continental Illinois National Bank & Trust Co. of Chicago.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge:

The issue presented on this appeal is of considerable importance to American banks with branches or offices in foreign jurisdictions. We are called upon to decide whether a domestic bank may refuse to comply with a valid Grand Jury subpoena *duces tecum* requiring the production of documents in the possession of a foreign branch of the bank on the ground that compliance would subject it to civil liability under the law of the foreign state.

The district judge's factual recitation, carefully set forth upon the conclusion of the hearing on contempt, makes it unnecessary for us to do more than sketch the facts briefly.

On March 7, 1968, First National City Bank of New York [Citibank] was served with a subpoena *duces tecum* in connection with a federal Grand Jury investigation of certain alleged violations of the antitrust laws by several of its customers.[1] The subpoena required the production of documents located in the bank's offices in New York City and Frankfurt, Germany, relating to any transaction in the name of (or for the benefit of) its customers C. F. Boehringer & Soehme, G.m.b.H., a German corporation, and Boehringer Mannheim Corporation, a New York corporation [referred to jointly hereinafter as "Boehringer"].[2] Citibank complied with the subpoena insofar as it called for the production of material located in New York but failed to produce or divulge any documents reposited in Frankfurt. Indeed, the bank even refused to inquire or determine whether any relevant papers were overseas. Instead, William T. Loveland, Citibank's vice-president responsible for the decision to defy the subpoena, appeared before the Grand Jury and asserted that the bank's action was justified because compliance would subject Citibank to civil liability and economic loss in Germany.

On May 8, 1968, Judge Pollack conducted an initial hearing at which the

---

1. Citibank is organized under the laws of the United States and has its principal place of business in the Southern District of New York.

2. Citibank does not contend that records located in its Frankfurt branch are not within the possession, custody and control of the head office. See United States v. First National City Bank, 379 U.S. 378, 384, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); First National City Bank of New York v. Internal Revenue Service etc., 271 F.2d 616, 618–619 (2d Cir. 1959), cert. denied, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960).

sole witness was Dr. Martin Domke, an expert in German law. He testified on behalf of Citibank that under the "bank secrecy law" of Germany, a bank—including a foreign bank (such as Citibank) licensed to do business in Germany—cannot divulge information relating to the affairs of its customers even in response to the process of a court of the United States. To do so, he claimed, would amount to a breach of the bank's "self evident" contractual obligation which flows from the business relationship between bank and customer. Domke made it clear that bank secrecy was not part of the statutory law of Germany; rather, it was in the nature of a privilege that could be waived by the customer but not the bank. He insisted that a violation of bank secrecy could subject the bank to liability in contract or tort but not to criminal sanctions or their equivalent. But, he made it plain, that it was a simple matter for a bank customer to obtain an *ex parte* restraining order enjoining a bank from disclosing privileged material and that a violation of such an injunction would be punished under a general provision of the criminal law governing violations of court orders.[3] As a result of this testimony, the district judge appropriately decided to adjourn this hearing in order to afford an opportunity to Citibank to ascertain whether its customers would obtain such an injunction and which would have the effect of subjecting the bank to criminal penalties if it complied

with the subpoena. This did not prove fruitful however, for the very next day, the court was advised by Citibank's counsel that Boehringer did not intend to take advantage of the readily available injunctive procedures under German law. Instead, the judge was told that Boehringer had informed Citibank that it would have to "suffer the consequences" if it obeyed the subpoena. It was suggested that Boehringer would sue the bank for breach of contract and would also use its influence within German industrial circles to cause Citibank to suffer business losses.[4]

In any event, Citibank remained adamant in its refusal to produce the documents located in Frankfurt and on May 21, 1968, a second hearing was held, this time on the government's order to show cause why the bank and Loveland should not be held in civil contempt. Domke testified once again as did a government expert, Dr. Magdalena Schoch. Both witnesses discussed with great particularity the precise nature of German bank secrecy[5] and Citibank's prospective liability under German law if it were sued for disclosing privileged information. Domke made the point that compulsion by an American court would not be accepted as an excuse for violating bank secrecy and that in a civil suit under German law the court would determine "in its free discretion" the amount of damages, if any. Schoch insisted, however, that Citibank would have a number of valid defenses in the event

---

3. Section 890 of the German Code of Civil Procedure provides that:

   "If the defendant violates his duty to omit an act or to suffer the commission of an act, the Court of first instance, on application of the plaintiff, must punish him, the defendant, for each violation with a fine or with jail up to six months. * * * *"

   Although this section is found in the Code of Civil Procedure the penalties it prescribes are considered criminal sanctions.

4. Dr. Domke testified that if he were representing Boehringer in Germany, he would advise his client not to seek an in-

junction enforceable under Section 890, see note 3, *supra*, until the court in the United States had decided whether to enforce the subpoena.

5. In addition, an official of the German Consulate General in New York, introduced a statement from the Bundesbank—the central bank of Germany roughly equivalent to the Federal Reserve Bank—defining the German policy of bank secrecy. This statement was in broad terms, not addressed to the specific facts of the instant litigation, and did not add to or contradict the testimony of either expert witness in any significant way.

Boehringer ever sued.[6] Moreover, Schoch's testimony made clear that in a criminal proceeding in Germany bank secrecy does not provide a basis for refusing to obey a court order to provide evidence.[7]

In a reasoned opinion, Judge Pollack concluded that Citibank had failed to present a legally sufficient reason for its failure to comply with the subpoena. He determined that it was manifest that Citibank would not be subject to criminal sanctions or their equivalent under German law, that it had not acted in good faith,[8] and that there was only a "remote and speculative" possibility that it would not have a valid defense if it were sued for civil damages. Accordingly, he adjudged the bank and Love-

land to be in civil contempt and fined the bank $2,000 per day for its failure to act; he sentenced Loveland to 60 days' imprisonment.[9] For the reasons stated below, we conclude that Judge Pollack's order was justified and affirm.

■ The basic legal question confronting us is not a total stranger to this Court. With the growing interdependence of world trade and the increased mobility of persons and companies, the need arises not infrequently, whether related to civil or criminal proceedings, for the production of evidence located in foreign jurisdictions. It is no longer open to doubt that a federal court has the power to require the production of documents located in foreign countries if the court has *in personam* juris-

---

6. Dr. Schoch testified that if Citibank were sued by Boehringer, the bank could plead compulsion by an American court as a complete defense to the action. She indicated that performance of the bank's contract with Boehringer would be excused under German doctrines of impossibility of performance and of requiring only the "good faith" performance of contracts taking into consideration ordinary usage. Similar defenses were said to apply if Citibank were sued in tort. Moreover, Dr. Schoch indicated that Section 25 of Citibank's written contract with Boehringer —which provides that "The bank is not liable for any losses caused by disturbances of its operations or by domestic or foreign acts of authorities at home or abroad"—would provide another defense to a civil suit since the process of an American court would be considered the act of a "foreign authority." Cf. First National City Bank v. Internal Revenue Service etc., *supra*, 271 F.2d at 619–620 of New York (Panamanian provision dealing with disclosure pursuant to the order of "a competent authority and by means of legal formalities" not limited to proceedings of Panamanian authority). She testified further that Boehringer would have to prove actual damages resulting from the disclosure but could not recover for "loss of face or mental upset." (And, we note that, in any event, any disclosure by Citibank would be made to the Grand Jury whose proceedings are kept secret.) Finally, Schoch gave her opinion that Citibank would have an action for damages against Boehringer under German law if Boehringer made good its threat to cause Citibank to lose business.

7. The subpoena *duces tecum*, requiring the actual production of documents or other matter, is a procedural device unknown to German law. Instead, a party or witness is apparently required to testify with respect to relevant information; he need not, however, produce actual records.

8. Judge Pollack based his finding of lack of good faith on the fact that Citibank, as noted above, had failed to even make a simple inquiry into the nature or extent of the records available at the Frankfurt branch. In addition, the expert testimony was clear that the bank secrecy doctrine applied only to material entrusted to a bank within the framework of any confidential relationship of bank and customer but not to records that were the bank's own work product. Citibank failed to produce any documents reflecting its own work product that were within the terms of the subpoena or to indicate that none existed.

9. By the terms of the District Court's order, Citibank and Loveland were cited for *civil* contempt, both penalties to cease upon compliance with the subpoena. Also, the punishment could not extend beyond the expiration of the life of the Grand Jury. See Loubriel v. United States, 9 F.2d 807 (2d Cir. 1926); United States v. Collins, 146 F. 553 (D.C.D.Or.1906). See also Howard v. United States, 182 F. 2d 908, 914 (8th Cir.1950), vacated as moot, 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651 (1950).

diction of the person in possession or control of the material. See, e.g., First National City Bank of New York v. Internal Revenue Service etc., 271 F.2d 616 (2d Cir. 1959), cert. denied, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960). Thus, the task before us, as Citibank concedes, is not one of defining power but of developing rules governing the proper exercise of power. The difficulty arises, of course, when the country in which the documents are located has its own rules and policies dealing with the production and disclosure of business information—a circumstance not uncommon. This problem is particularly acute where the documents are sought by an arm of a foreign government. The complexities of the world being what they are, it is not surprising to discover nations having diametrically opposed positions with respect to the disclosure of a wide range of information. It is not too difficult, therefore, to empathize with the party or witness subject to the jurisdiction of two sovereigns and confronted with conflicting commands. For an example of a comparable dilemma resulting from the application of the antitrust laws, see British Nylon Spinners, Ltd. v. Imperial Chemical Industries, Ltd., [1953] 1 Ch. 19. See also Note, Limitations on the Federal Judicial Power to Compel Acts Violating Foreign Law, 63 Colum.L.Rev. 1441 (1963); Note, Subpoena of Documents Located in Foreign Jurisdictions, 37 N.Y.U.L.Rev. 295 (1962).

■■ In any event, under the principles of international law, "A state having jurisdiction to prescribe or enforce a rule of law is not precluded from exercising its jurisdiction *solely* because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct." Restatement (2d), Foreign Relations Law of the United States, § 39(1) (1965) (emphasis supplied). It is not asking too much however, to expect that each nation should make an effort to minimize the potential conflict flowing from their joint concern with the prescribed behavior. Id. at § 39(2). Compare Report of Oral Argument, 25 U.S. L.W. 3141 (Nov. 13, 1956), Holophane Co. v. United States, 352 U.S. 903, 77 S. Ct. 144, 1 L.Ed.2d 114 (1956). Where, as here, the burden of resolution ultimately falls upon the federal courts, the difficulties are manifold because the courts must take care not to impinge upon the prerogatives and responsibilities of the political branches of the government in the extremely sensitive and delicate area of foreign affairs. See, e. g., Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Mechanical or overbroad rules of thumb are of little value; what is required is a careful balancing of the interests involved and a precise understanding of the facts and circumstances of the particular case.

■ With these principles in mind, we turn to the specific issues presented by this appeal. Citibank concedes, as it must, that compliance with the subpoena does not require the violation of the criminal law of a foreign power, as in Societe Internationale etc. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (discovery under the Federal Rules of Civil Procedure); Ings v. Ferguson, 282 F.2d 149, 152, 82 A.L.R.2d 1397 (2d Cir.1960), or risk the imposition of sanctions that are the substantial equivalent of criminal penalties, as in Application of Chase Manhattan Bank, 297 F.2d 611, 613 (2d Cir. 1962), or even conflict with the public policy of a foreign state as expressed in legislation, compare Restatement, supra, § 39, Reporters' Notes at p. 113. Instead, all that remains, as we see it, is a possible prospective civil liability flowing from an implied contractual obligation between Citibank and its customers that, we are informed, is considered implicit in the bank's license to do business in Germany.

But, the government urges vigorously, that to be excused from compliance with an order of a federal court, a witness,

such as Citibank, must show that following compliance it will suffer criminal liability in the foreign country. We would be reluctant to hold, however, that the mere absence of criminal sanctions abroad necessarily mandates obedience to a subpoena. Such a rule would show scant respect for international comity; and, if this principle is valid, a court of one country should make an effort to minimize possible conflict between its orders and the law of a foreign state affected by its decision. Cf. Restatement, supra, § 39(2); Ings v. Ferguson, supra, 282 F.2d at 152. The vital national interests of a foreign nation, especially in matters relating to economic affairs, can be expressed in ways other than through the criminal law. For example, it could not be questioned that, insofar as a court of the United States is concerned, a statement or directive by the Bundesbank (the central bank of Germany) or some other organ of government, expresses the public policy of Germany and should be given appropriate weight. Equally important is the fact that a sharp dichotomy between criminal and civil penalties is an imprecise means of measuring the hardship for requiring compliance with a subpoena. In Application of Chase Manhattan Bank, supra, this Court affirmed the modification of a subpoena because strict obedience would have resulted in a violation of Panamanian law punishable by a fine of not more than 100 Balboas (equivalent to $100); we held that a violation was the equivalent of a misdemeanor under our criminal law. It would be a gross fiction to contend that if the Bundesbank were to revoke the license of Citibank for a violation of bank secrecy the impact would be less catastrophic than having to pay an insignificant fine because the revocation is theoretically not "equivalent to a misdemeanor" or criminal sanction. We are not required to decide whether penalties must be under the "criminal law" to provide a legally sufficient reason for noncompliance with a subpoena; but, it would seem unreal to let all hang on whether the label "criminal" were attached to the sanction and to disregard all other factors. In any event, even were we to assume *arguendo* that in appropriate circumstances civil penalties or liabilities would suffice, we hold that Citibank has failed to provide an adequate justification for its disobedience of the subpoena.

In evaluating Citibank's contention that compliance should be excused because of the alleged conflict between the order of the court below and German law, we are aided materially by the rationale of the recent Restatement (2d), Foreign Relations Law of the United States, § 40 (1965):

> Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as
>
> (a) vital national interests of each of the states,
>
> (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,
>
> (c) the extent to which the required conduct is to take place in the territory of the other state,
>
> (d) the nationality of the person, and
>
> (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

In the instant case, the obvious, albeit troublesome, requirement for us is to balance the national interests of the United States and Germany and to give appropriate weight to the hardship, if any, Citibank will suffer.

The important interest of the United States in the enforcement of the subpoena warrants little discussion. The federal Grand Jury before which Citibank

was summoned is conducting a criminal investigation of alleged violations of the antitrust laws. These laws have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court. We would have great reluctance, therefore, to countenance any device that would place relevant information beyond the reach of this duly impaneled Grand Jury or impede or delay its proceedings. Judge Learned Hand put the issue in perspective many years ago: "The suppression of truth is a grievous necessity at best, more especially where as here the inquiry concerns the public interest; it can be justified at all only where the opposing private interest is supreme." McMann v. S. E. C., 87 F.2d 377, 378, 109 A.L.R. 1445 (2d Cir.1937), cert. denied, McMann v. Engle, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937).

We examine the importance of bank secrecy within the framework of German public policy with full recognition that it is often a subtle and difficult undertaking to determine the nature and scope of the law of a foreign jurisdiction. There is little merit, however, in Citibank's suggestion that the mere existence of a bank secrecy doctrine requires us to accept on its face the bank's assertion that compliance with the subpoena would violate an important public policy of Germany. See First National City Bank of New York [appellant herein] v. Internal Revenue, Service etc., 271 F.2d 616, 619 (2d Cir.1959), cert. denied, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed. 2d 381 (1960) (analyzing, and rejecting, Citibank's contention that enforcement of a federal court order would require a violation of the law of Panama). While we certainly do not intend to deprecate the importance of bank secrecy in the German scheme of things, neither can we blind ourselves to the doctrine's severe limitations as disclosed by the expert testimony. We have already made

the assumption that the absence of criminal sanctions is not the whole answer to or finally determinative of the problem. But, it is surely of considerable significance that Germany considers bank secrecy simply a privilege that can be waived by the customer and is content to leave the matter of enforcement to the vagaries of private litigation. Indeed, bank secrecy is not even required by statute. See Restatement, supra, § 40, comment (c): "A state will be less likely to refrain from exercising its jurisdiction when the consequence of obedience to its order will be a civil liability abroad." See also Restatement, supra, § 39, Reporters' Notes at p. 113.

Moreover, Section 300 of the Criminal Code of Germany provides that:

Anybody who without authority discloses the secrets of another, shall be punished by imprisonment for a term not to exceed six months or by a fine, if the secret was intrusted or became known to him in his capacity as a

(1) Physician, dentist, pharmacist [and similar professions]

(2) Attorneys, patent attorney, notary public, defense counsel, auditor, Certified Public Accountant, or tax consultant.

It is not of little significance that a German court has noted, "The fact that bank secrecy has not been included in the penal protection of Section 300 of the Criminal Code must lead to the conclusion that the legislature did not value the public interest in bank secrecy as highly as it did the duty of secrecy of doctors and attorneys." District Court of Frankfurt (1953). Further, Section 53 of the German Code of Criminal Procedure grants the right of refusal to testify to a number of persons, ranging from clergymen and mid-wives to publishers and printers; again, reference to bankers is conspicuously absent.[10] It would be anomalous if Citibank, deprived of any right to assert bank secre-

10. The omission of bankers cannot be considered accidental. Bankers are apparently privileged to refuse testimony in a civil

proceeding. See Article 383 of the German Code of Civil Procedure.

cy in a criminal investigation conducted in Germany, could—in the absence of statutes imposing greater limitations upon foreign governments, cf. First National City Bank of New York v. Internal Revenue Service etc., supra, 271 F.2d at 619–620—benefit from German bank secrecy in a criminal investigation in the United States.[11]

In addition, it is noteworthy that neither the Department of State nor the German Government has expressed any view on this case or indicated that, under the circumstances present here, enforcement of the subpoena would violate German public policy or embarrass German-American relations.[12] The Supreme Court commented on this aspect in other litigation involving Citibank: "[If] the litigation might in time be embarrassing to United States diplomacy, the District Court remains open to the Executive Branch, which, it must be remembered, is the moving party in the present proceeding." United States v. First National City Bank, 379 U.S. 378, 384–385, 85 S.Ct. 528, 532, 13 L.Ed.2d 365 (1965). We are fully aware that when foreign governments, including Germany, have considered their vital national interests threatened, they have not hesitated to make known their objections to the enforcement of a subpoena to the issuing court. See, e.g., In re Grand Jury Investigation of the Shipping Industry, 186 F.Supp. 298, 318 (D. C.1960). So far as appears, both the United States and German governments have voiced no opposition to Citibank's production of the subpoenaed records.

We turn now to the nature and extent of the alleged hardships to which Citibank would be subjected if it complied with the subpoena. It advances two grounds on which it will suffer injury. First, it states that it will be subjected to economic reprisals by Boehringer and will lose foreign business that will harm it and the economic interests of the United States. It paints a dismal picture of foreign companies boycotting American banks for fear that their business records will be subject to the scrutiny of our courts. A partial answer is that the protection of the foreign economic interests of the United States must be left to the appropriate departments of our government, especially since the government is the moving litigant in these proceedings. Cf. United States v. First National City Bank, supra. Moreover, and not without importance, is the fact that the alleged economic reprisals are of doubtful legal relevance in light of the Supreme Court's rejection of a similar argument in First National City Bank (Omar), see 379 U. S. at 402, 85 S.Ct. 528 (dissenting opinion of Justice Harlan), and this Court's decision in First National Bank of New York v. Internal Revenue Service, etc., supra, 271 F.2d at 619, n. 2; and the factual underpinning for this claim is quite feeble considering Citibank's overseas growth following the decision in First National City Bank (Omar), supra.[13]

Second, Citibank complains that it will be subjected to civil liability in a suit by Boehringer. The importance of the possible financial loss Citibank might suffer as a result of such a suit must be viewed in light of Loveland's statement that: "[W]e were not concerned with

---

11. While it may be true that the subpoena *duces tecum* is unknown to German law, see note 7, *supra*, the important point is that bank secrecy is no bar to as much disclosure as German law ever requires in a criminal proceeding; it should have no greater impact in a criminal proceeding in this country.

12. The Consulate General of Germany did, however, introduce a document describing the nature of bank secrecy. See note 5, *supra*.

13. The government stated at oral argument, and Citibank does not contend otherwise, that the bank's overseas growth rate has increased in the years since the Supreme Court rejected its contention in First National City Bank (Omar), that the Court's decision would subject the bank to severe economic consequences overseas.

this isolated case and what one individual might do. The importance [sic], I believe, is the effect that it would have on our operations all over the world * * *." We have already rejected the contention that Citibank's alleged loss of business abroad is a sound justification for disobedience of the subpoena. In any event, Judge Pollack concluded that risk of civil damages was slight and speculative, and we agree. The chance that Boehringer will suffer compensable damages is quite remote and Citibank appears to have a number of valid defenses if it is sued, both under the terms of the contract and principles of German civil law.[14] In addition, as we have noted, German courts are given wide latitude in determining whether to award any damages even in the face of liability. In the unlikely event that Boehringer were to sue Citibank, we cannot believe that Boehringer's adamant refusal to apply for a readily available injunction will pass unnoticed by the Court.

■ Finally, additional factors support our conclusion that the district judge was correct in citing Citibank and Loveland for civil contempt. As noted above, Citibank has failed to produce or segregate documents or records which reflect the bank's own work product. And, the expert testimony indicated that disclosure of such material would not violate any policy of bank secrecy.[15] Moreover, one of the companies being investigated by the Grand Jury—Boehringer Mannheim Corporation—is incorporated in New York. Whatever one may think of requiring disclosure of records of a German corporation reposited in a bank in Germany, surely an American corporation cannot insulate itself from a federal Grand Jury investigation by entering into a contract with an American bank abroad requiring bank secrecy. Compare Restatement, supra, § 40, Comment (c). If indeed Citibank might suffer civil liability under German law in such circumstances, it

must confront the choice mentioned in First National City Bank of New York v. Internal Revenue Service etc., supra, 271 F.2d at 620—the need to "surrender to one sovereign or the other the privileges received therefrom" or, alternatively a willingness to accept the consequences.

Since the life of the Grand Jury is rapidly drawing to a close, we direct that the mandate issue forthwith but that it be stayed for a period of seven days from the date of the filing of this opinion to permit Citibank, if it so chooses, to apply to the Supreme Court or a Justice thereof for a further stay or other relief.

Affirmed.