The **UNITED STATES of America,**
**et al., Petitioners,**

v.

The **CHASE MANHATTAN BANK, N.A.,**
**et al., Respondents.**

No. M–18–304.

United States District Court,
S.D. New York.

March 27, 1984.

Rudolph Giuliani, U.S. Atty. for the Southern Dist. of N.Y., New York City, for petitioner; Jonathan A. Lindsey, Asst. U.S. Atty., of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for respondent Chase Manhattan Bank, N.A.; William H. Roth, New York City, of counsel.

Patton, Boggs & Blow, Washington, D.C., for respondent F.D.C. Co., Ltd.; Allan Abbot Tuttle, George M. Borababy, Do-

menico De Sole, Washington, D.C., of counsel.

## OPINION

GOETTEL, District Judge:

Before the Court is a petition to enforce a summons issued by the Internal Revenue Service ("the IRS"), by which it seeks to obtain the banking records of F.D.C. Co., Ltd. ("FDC"), a Hong Kong corporation, that are now in the custody and control of a Hong Kong branch of Chase Manhattan Bank, N.A. ("Chase"). The IRS seeks the records in connection with its investigation of Aldo Gucci and Gucci Shops, Inc. (hereinafter referred to as either "Gucci," "Gucci Shops," or "the taxpayers"). The Government also seeks an order directing FDC to withdraw an action now pending before the Supreme Court of Hong Kong, in which FDC seeks to make permanent an interim order enjoining Chase from complying with the IRS summons. Finally, the IRS seeks an order from this Court directing FDC to waive its right of secrecy under Hong Kong law.

Defendants Chase and FDC respond to this petition in very different ways. Chase moves to quash the summons, claiming that an order compelling it to produce FDC's records would force Chase to choose between violating an order of this Court or violating the order of the Hong Kong court, as well as Hong Kong's bank secrecy law. In the alternative, Chase seeks an order directing FDC to withdraw its Hong Kong action and to waive its rights under Hong Kong law to have the secrecy of its banking records preserved. FDC responds by claiming that this Court lacks personal jurisdiction over it because FDC is not present in the United States, does no business here, and has no officers or directors here. FDC further asserts that this Court lacks jurisdiction to order FDC to withdraw its Hong Kong action or to waive its rights

to preserve the secrecy of its banking records, and also that FDC was not properly served with process. For all of these reasons, FDC moves for dismissal of the claims against it.

Obviously, these motions pose difficult questions of jurisdiction and international law that go far beyond the issues normally posed in summons enforcement actions. The Court, however, finds it unnecessary to reach all of the questions presented by the parties to this complex proceeding. For the present, the Court need only consider the IRS's motion to enforce its summons and Chase's cross-motion to quash.[1] Decision is reserved, therefore, on FDC's motion to dismiss, and on the motions by the Government and Chase to direct FDC to withdraw its Hong Kong court actions and to waive its bank secrecy rights.

For the reasons discussed below, the Court grants the Government's motion to enforce the summons issued to Chase and denies Chase's motion to quash.

## BACKGROUND

The summons at issue was served on Chase on December 29, 1983, in connection with an investigation into the tax liabilities of taxpayers Gucci and Gucci Shops for the 1979, 1980, and 1981 tax years. The investigation was jointly undertaken by the Criminal Investigation Division and Examination Division of the IRS to examine all sources of income properly attributable to the taxpayers, as well as to investigate all expenses deductible from their income. The purpose of the investigation was to evaluate the validity of their tax returns.

According to the affidavit of IRS Special Agent Richard J. Collery ("Collery"), submitted by the Government, there was an unusually close relationship between the taxpayers and FDC. Indeed, according to Exhibit A to Collery's affidavit, it appears that FDC may very well have been created as a corporate front to collect income that

---

1. The Supreme Court of Hong Kong is scheduled to hear argument of FDC's petition to have its interim injunction made final on March 28. It is the imminence of that hearing that impels this Court to act immediately on the cross-motions for enforcement of this summons. A decision here may be of some help to the Hong Kong trial court when it reconsiders its initial order enjoining Chase from complying with the summons.

was properly attributable to the taxpayers and to "manufacture" expenses that the taxpayers could charge against their income.[2] Furthermore, Exhibit B to Collery's affidavit provides additional evidence of the unusually close relationship between the taxpayers and FDC. The exhibit consists of two letters. The first, on Gucci Shops letterhead, from Gucci to Cyril Magnin, chairman of Joseph Magnin, a department store, granted Magnin a franchise to operate Gucci shops. The letter, ironically dated April 15, 1978, and signed by both men, contains a detailed description of the agreement and required Gucci Shops personnel to visit the Magnin-operated Gucci shops to advise Magnin on their operations. The second letter, also dated April 15, is addressed only to "F.D.C. Company," is on non-letterhead stationery, and is signed only by Cyril Magnin. By this letter, Joseph Magnin agreed to pay FDC a royalty of ten percent of the value of all merchandise purchased by Magnin from Gucci. In return, FDC was to serve as fashion design consultant for a period of ten years. This second letter contains no details, does not specify what services, if any, FDC was to provide, or how they would be provided.

**2.** Exhibit A is a three-page letter signed by Edward H. Stern ("Stern"), a certified public accountant in New York, addressed to "Dr. Aldo Gucci," at the New York address of Gucci Shops, Inc. In the letter, which is dated October 20, 1975, Stern explains that FDC has been incorporated in Hong Kong with 2,500 shares of capital stock to be owned equally by two Panamanian corporations—Vanguard International Manufacturing, Ltd., and Anglo American Manufacturing Researches, Ltd. Stern continues by advising that FDC should send sketches and designs to Gucci Shops for approval. "The more numerous and varied such sketches are, the better will be the possibility for substantiation of this as an expense by Gucci Shops, Inc." Exhibit A at 1. Stern further advises that the flow of sketches "is only to build up some sort of record for our future needs." *Id.* Stern also notes that Kerry Obonai ("Obonai")—FDC's affiant to the fact that FDC has no officers or directors in the United States, is not present here, and does no business here—"asked about compensation for himself for services given to F.D.C." and that Stern has informed Obonai "that arrangements for such compensation would have to be made directly with" Dr. Gucci. *Id.* at 2. Stern goes on in the letter to report

In addition, there is no evidence that FDC actually had a staff that could provide any consulting services. Finally, the Magnin letter provides that payments to FDC were to be made monthly by mail to FDC's post office box in New Jersey, not to its Hong Kong address.

The allegations that FDC served as a conduit for income that was properly attributable to the taxpayers[3] is bolstered by a supplemental affidavit executed by Collery. In this supplemental affidavit, Collery asserts that:

(1) during each of the three years under investigation, payments of nearly $1 million per year were made to FDC by Gucci franchisees,[4] and FDC collected from Gucci Shops itself approximately $250,000 during 1978 and 1979 for fashion consulting services;

(2) papers opening FDC's account with Chase in Hong Kong in 1975 listed as directors and authorized signatories Edward Stern ("Stern"), accountant for Gucci Shops, Marie Savarine ("Savarine"), treasurer and president of Gucci Shops, and Kerry Obonai ("Obonai"), FDC's managing director in Hong Kong;

that an account for FDC has been opened at the Chase branch in Hong Kong and that checks drawn against that account will have to be signed by either Stern, Obonai, or Marie Savarine, a Gucci Shops executive in New York, and that Stern has brought a checkbook for that account back to New York where it is to be kept.

**3.** Put simply, the Government alleges that FDC was created to collect income which properly should have been taxable income to Gucci Shops and Aldo Gucci, and that at least some of the invoices billed to Gucci Shops by FDC were written solely for the purpose of creating "expenses" that Gucci Shops could apply against its income to reduce its tax liability. The funds thus "earned" by FDC, the Government alleges, were later passed back to Gucci overseas and out of the reach of the IRS.

**4.** During fiscal 1982, according to Collery's supplemental affidavit, the franchisees who had been paying approximately $1 million a year to FDC abruptly started making their payments to Gucci Shops, another indication that FDC may have been nothing more than a "front" for the taxpayers.

·(3) both Stern and· Savarine occupied offices at Gucci Shops' New York office;

(4) Savarine listed herself as secretary of FDC on the application for the New Jersey post office box at which FDC received checks from Gucci Shops' franchisees, and after the post office box was closed in 1982, mail addressed to it waś forwarded to Savarine's residence;

(5) under Savarine's direction, a bookkeeper at Gucci Shops' New York office prepared bills on FDC letterhead for the ten percent "consulting fees" due FDC under the agreement between Gucci Shops and its franchisees, and that these bills were mailed to the franchisees from New York;

(6) on several occasions, various franchisees mailed checks for the amounts due FDC to Savarine personally at Gucci's New York offices, and on at least one occasion, Savarine, acting as president of Gucci Shops, transmitted one such check to Obonai in Hong Kong with directions to deposit the check in FDC's account at Chase and to return a copy of the deposit ticket to New York; and

(7) in November 1978, a check for more than $250,000 from Gucci Shops to FDC, for consulting services rendered in the year ended August 31, 1978, was negotiated at Chase's International Banking Department in New York.

It is on the basis of the foregoing facts, none of which are disputed by any of the parties, that this Court must decide whether to enforce or quash the summons.

DISCUSSION

A. *The Government Has Shown Its Need for the Information Sought.*

▮ The summons power of the IRS is regarded as a broad mandate designed to give it the authority and means necessary to enforce the revenue laws. Generally, to obtain enforcement of a summons, the IRS need only meet a rather low threshold test. *See United States v. Arthur Young & Co.,* 677 F.2d 211, 218–19 (2d Cir.1982), *aff'd in part, rev'd in part on other grounds,* — U.S. ——, 104 S.Ct. 1495, 79 L.Ed.2d 826

(March 21, 1984), and cases cited therein. The IRS "must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required ... have been followed ...." *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–58, 13 L.Ed.2d 112 (1964).

There can be little doubt that the summons for documents served on Chase meets all ·of these requirements. Collery's two affidavits, and the exhibits appended thereto, present a situation that is certainly worthy of additional investigation. Furthermore, it appears highly likely that the documents in the possession of Chase will provide the IRS with the facts it needs to decide what action, if any, to take against the taxpayers under investigation. For these reasons, enforcement of the IRS summons should be granted.

Were this an ordinary summons enforcement action, our inquiry would end here and an order directing compliance with the IRS summons would issue. However, since the records sought by the IRS are in the custody and control of a Chase branch in Hong Kong, we are confronted with a difficult question of international law. It is to that question that we now turn.

B. *Balance of National Interests Requires an Order Enforcing the Summons*

Chase is in an understandably difficult position, faced as it is with the prospect of an order of this Court directing it to produce FDC's records and a contrary, interim injunction of the Hong Kong Supreme Court ordering it not to release the records on pain of being held in contempt. Thus, it is not surprising that Chase seeks to· escape its dilemma by asking this Court to quash the summons. Based on an examination of the applicable laws of Hong Kong and the United States and a balancing of the relative interests of the two jurisdictions in the resolution of this issue, the

Court concludes, however, that it must enforce the summons and order Chase to produce FDC's records.

### 1. *Hong Kong Law*

██ In support of its contention that it may not produce FDC's records, Chase has submitted the affidavit of Vincent Edgar Bramhall, its Hong Kong solicitor. Relying on two English cases, he advises that bank patrons have a common law right to the preservation of the secrecy of their banking records.

In the first case, *Tournier v. National Provincial and Union Bank of England,* 1 K.B. 461 (1924), the Court of Appeal held that a bank has a general duty of secrecy arising as an implied term of the contract between the bank and its customer and that this duty continues even after the account is closed or the relationship between the bank and customer concludes. There are, however, at least four exceptions to this general rule: (1) where there is an independent duty to the public to disclose; (2) where the customer expressly or impliedly consents to disclosure; (3) where the interests of the bank require disclosure; and (4) where disclosure is under compulsion of the law. *Id.* at 473.

While it certainly appears at first that the fourth exception applies in the instant case, Bramhall argues that it does not. He refers the Court to *X A.G. and others v. A Bank,* 2 All E.R. 464 (1983), in support of his argument that the compulsion-of-law exception applies only to a situation in which British law requires disclosure. In *X A.G.,* a British court was faced with a petition to enjoin the British branch of a United States bank from complying with an order from a federal district court compelling the United States bank to produce a Swiss firm's bank records that were being held in the bank's London office. The British court held that British law, not New York law, applied because the bank and the Swiss firm had intended that British law govern their banking relationship. The court went on to say that, under *Tournier,* a United States court order was insufficient to compel the production of documents, and that, since the United States court had created the dilemma for its own national, it should resolve the dilemma by refraining from holding the bank in contempt.

It should be pointed out, however, that there are a number of facts which sharply distinguish this case from *X A.G.* First, the British court gave great weight to the fact that the subpoena involved there was issued "ex parte and in camera" without any "evidence about what material, if any, was available to the district judge when the order was made," *id.* at 470; here, in contrast, the government has made a clear and public record of its need for FDC's bank records. Second, in *X A.G.,* there was evidence that information obtained by grand jury subpoenas frequently was leaked to newspapers, often by government sources, *id.* at 471; here, there is little or no danger of public leaks. Third, in *X A.G.,* the court was concerned that great damage would be done to the Swiss firm if its records were made public because they would reveal the firm's patterns of commodities trading and potentially cause trading disruptions, *id.* at 472; here, there is no indication that FDC's business would be disrupted or that its customers might be embarrassed.[5] Thus, the Court concludes that *X A.G.* offers Chase less than firm support for its argument that this case does not fall within the fourth exception outlined in *Tournier.*

Moreover, the Court notes that reference is made in *Tournier, supra,* 1 K.B. at 473, to other exceptional circumstances, which Bramhall conveniently ignores in his affidavit. For example, in his opinion, Bankes,

---

5. Indeed, the plaintiffs' concern about adverse publicity was so great in *X A.G.* that they proceeded pseudonymously. Here, FDC is proceeding under its own name, apparently unconcerned about any harm that might result from publicity concerning this case. Furthermore, FDC is itself not the target of the IRS investigation, as were the plaintiffs in *X A.G.,* and it will apparently not suffer any penalties even if the investigation does uncover any improprieties in the way FDC was used by the taxpayers.

L.J., notes that there are situations in which a banker has a "higher duty" to disclose banking records, such as when there is a "danger to the state." *Id.* In the same vein, Atkin, L.J., notes in his opinion that a bank may have to disclose records if such disclosure is necessary to protect "the public against fraud or crime." *Id.* at 486. Certainly, under this standard Collery's two affidavits and accompanying exhibits spell out a sufficiently strong charge of fraud, if not public danger, to require disclosure.

In addition, the Court notes two technical, but nonetheless important, points. First, Hong Kong's bank secrecy requirement is based only on case law, not statutes, as is the case in some countries, such as Switzerland. Case law is more easily modified than statutory law, leaving the Hong Kong court room to take into consideration the special circumstances that a case such as this one presents. Second, it is not clear from Bramhall's affidavit that British law is binding precedent on a Hong Kong court rather than merely persuasive authority that may be either accepted as is or altered to fit the local needs of Hong Kong.

Under these circumstances, this Court believes that the Hong Kong court may well be willing to give strong consideration to the special requirements of international banking organizations, such as Chase, to comply with the laws of their domiciliary nations, and with the needs of those nations to enforce their revenue laws. If this assumption is true, then there is every reason to anticipate that the Hong Kong court will not extend the interim injunction it has imposed upon Chase.

2. *United States Law*

██ The law in the United States is that the production of documents may not be resisted merely because the documents are located abroad. *Marc Rich & Co., A.G. v. United States,* 707 F.2d 663, 667 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983). In *Marc Rich,* the Second Circuit relied on its earlier holding in *United States v. First National City Bank,* 396 F.2d 897 (2d Cir.1968), in which the court first adopted the five-part test laid down in the *Restatement (Second) of Foreign Relations Law* § 40 (1965) [6] to decide whether it should order the production of such records. Section 40 provides:

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

*Id.* This test has been adopted not only by this circuit, but by others as well. *See, e.g., Securities and Exchange Commission v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 115 n. 2 (S.D.N.Y.1981); *United States v. First National Bank of Chicago,* 699 F.2d 341, 345 (7th Cir.1983); *United States v. Bank of Nova Scotia,* 691 F.2d 1384, 1389 n. 7 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *United States v. Vet-*

---

**6.** The *Restatement*'s § 40 is based on § 39, which states, in part:

A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in con-

duct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.
*Restatement (Second) of Foreign Relations Law* § 39 (1965).

*co*, 644 F.2d 1324, 1331 (9th Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

■ Applying the test here, we find, first, that the United States does have a vital interest at stake—the collection of tax revenues rightly due to it and the investigation of possible fraudulent schemes to avoid payment of taxes. As noted above, the IRS has made out a strong case for its need to investigate FDC's dealings with Gucci Shops. By contrast, Hong Kong's interest in this matter is not quite as important because there is no statute barring release of banking records and because the government of Hong Kong has not become a party to the case. These factors were considered important in *First National City, supra*, 396 F.2d at 903–04.

Second, there is no question that Chase would suffer some hardships if it faced inconsistent judgments by the two courts, for it would have to choose between risking a contempt proceeding in the United States and risking one in Hong Kong. However, the potential for real harm is much less than it might first appear because Chase could raise as a defense in either court, the order of the other court. Furthermore, as the *Restatement* notes, there is less reason for a court in one state to refrain from exercising its jurisdiction when the consequence of obedience to its order is merely civil, as opposed to criminal, liability in the other state. *Restatement (Second) of Foreign Relations Law, supra*, § 40, comment c.

Looking to the third factor, the extent to which the mandated conduct would take place abroad, the Court finds that very little action would be required to take place in Hong Kong. Chase could simply duplicate the documents at issue (if it has not already done so) and ship them to the United States either physically or by electronic means. There would be no need for a long and continuing course of conduct that the foreign jurisdiction might find offensive.

Turning to the fourth factor, the nationality of the person facing inconsistent orders, the Court again finds no reason to refrain from compelling production. Chase is an American corporation,[7] and the investigation for which the documents are being sought is of United States taxpayers.

Finally, considering the extent to which enforcement by action of either state can reasonably be expected to result in compliance, each state has considerable power to persuade Chase to comply with an order of its courts. With respect to this Court, it is clear that Chase is within its jurisdiction and that a substantial penalty for each day that Chase declines to comply with an order of this Court would be a potent and persuasive tool for obtaining Chase's compliance. The Court assumes that the Hong Kong court has the same discretion to impose, or not impose, a heavy penalty.

Weighing all of the five factors, the Court finds that the United States has a greater interest in obtaining the banking records of FDC than does Hong Kong in protecting the secrecy of bank records located there and that there would be comparatively little encroachment on Hong Kong's prerogatives by this Court's order to Chase to comply with the summons. Furthermore, other leading cases on the production of banking records located in foreign branches of domestic banks also persuade the Court that Chase must be ordered to produce the summoned documents. Looking at these cases as a whole, it is clear that in a situation such as the one presented by this case—where the foreign country has no bank secrecy statute, the holder of the records runs no risk of incurring criminal penalties, and this country has a clear and well-defined need for the records—the Court should order the bank

---

7. That a bank cannot serve two sovereigns was noted by the court in *United States v. First National City Bank*, 396 F.2d 897, 905 (2d Cir. 1968). But the court added that the bank's predicament is due to its having chosen to do business in a jurisdiction in which the laws are at odds with those of its home jurisdiction. In this situation, the bank must either surrender to one sovereign or the other in return for the privileges it receives "or alternatively ... accept the consequences." *Id.*

to produce the records. *Compare Marc Rich, supra,* 707 F.2d at 666 (where acts outside of jurisdiction have detrimental effect in it, court may order production of documents located abroad); *Bank of Nova Scotia, supra,* 691 F.2d at 1390–91 (Canadian bank with branches in the United States and Bahamas could be ordered to produce documents despite Bahamas bank secrecy law); *Vetco, supra,* 644 F.2d at 1333 (possible criminal penalties under Swiss law did not preclude enforcement of order to produce documents); *Banca Della Svizzera, supra,* 92 F.R.D. at 112 (despite potential criminal penalties under Swiss law, court ordered disclosure of subpoenaed documents); *with First National Bank of Chicago, supra,* 699 F.2d at 342 (risk of substantial criminal penalties under Greek banking laws led court not to order document production); *Application of Chase Manhattan Bank,* 297 F.2d 611, 613 (2d Cir.1962) (where production of documents would violate Panama law, court modified subpoena to exclude those documents).

### C. *Decision Reserved as to Other Motions*

The parties' other motions do not require the Court's urgent attention and have not been sufficiently well briefed to permit the Court to decide them at this time. Hence, the Court reserves decision on them until such time as the issues have been fully developed and the position of the Hong Kong court (and the consequences thereof) finally established.

In this regard, the Court notes that, before it can consider the Government's and Chase's identical motions for an order directing FDC to withdraw its request for a permanent injunction, the movants will have to submit supplemental briefs on the question of the Court's personal jurisdiction over FDC [8] and on the question of how this Court could practically and legally enforce an order directing FDC to withdraw its Hong Kong action. The Court is partic-

ularly concerned with its ability to enforce a directive to FDC (assuming jurisdiction is found) considering the extent to which it has reduced its American ties, and the fact that it is a Hong Kong corporation having, now, only Hong Kong directors and officers.[9]

CONCLUSION

In accordance with the above discussion, the Government's motion to compel Chase to produce the summoned documents is granted and Chase's motion to quash is denied. Decision is reserved on the motions by the Government and Chase to order FDC to withdraw its injunctive action before the Supreme Court of Hong Kong and to order FDC to waive its bank secrecy privilege, and on FDC's motion to dismiss for lack of jurisdiction and improper service of process.

SO ORDERED.

---

**8.** The initial question of jurisdiction is, of course, raised by FDC's motion to dismiss, as well.

**9.** *See, e.g.,* Note, *Is the International Olympic Committee Amenable to Suit in a United States Court?,* 7 Fordham Int'l L.J. 61, 79 (1984).