## CHICAGO & SOUTHERN AIR LINES, INC. *v.* WATERMAN STEAMSHIP CORP.

NO. 78.

Argued November 19, 1947.—Decided February 9, 1948.

*R. Emmett Kerrigan* argued the cause and filed a brief for petitioner in No. 78.

*Robert L. Stern* argued the cause for petitioner in No. 88. With him on the brief were *Solicitor General Perlman, Robert W. Ginnane, Emory T. Nunneley* and *Oliver Carter.*

*Bon Geaslin* argued the cause for respondent. With him on the brief were *Francis H. Inge* and *Joseph M. Paul, Jr.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

The question of law which brings this controversy here is whether § 1006 of the Civil Aeronautics Act, 49 U. S. C. § 646, authorizing judicial review of described orders of the Civil Aeronautics Board, includes those which grant or deny applications by citizen carriers to engage in overseas and foreign air transportation which are subject to approval by the President under § 801 of the Act. 49 U. S. C. § 601.

By proceedings not challenged as to regularity, the Board, with express approval of the President, issued an order which denied Waterman Steamship Corporation a certificate of convenience and necessity for an air route and granted one to Chicago and Southern Air Lines, a rival applicant. Routes sought by both carrier interests involved overseas air transportation, § 1 (21) (b), between Continental United States and Caribbean possessions and also foreign air transportation, § 1 (21) (c), between the United States and foreign countries. Waterman filed a petition for review under § 1006 of the Act with the Circuit Court of Appeals for the Fifth Circuit. Chicago and Southern intervened. Both the latter and the Board moved to dismiss, the grounds pertinent here being that because the order required and had approval of the President, under § 801 of the Act, it was not reviewable. The Court of Appeals disclaimed any power to question or review either the President's approval or his disapproval, but it regarded any Board order as incomplete until court review, after which "the completed action must be approved by the President as to citizen air carriers in cases under Sec. 801." 159 F. 2d 828. Accordingly, it refused to dismiss the petition and asserted jurisdiction. Its decision conflicts with one by the Court of Appeals for the Second Circuit. *Pan American Airways Co.* v. *Civil Aeronautics Board,* 121 F. 2d 810. We granted certiorari both to the Chicago and Southern Air Lines, Inc. (No. 78) and to the Board (No. 88) to resolve the conflict.

Congress has set up a comprehensive scheme for regulation of common carriers by air. Many statutory provisions apply indifferently whether the carrier is a foreign air carrier or a citizen air carrier, and whether the carriage involved is "interstate air commerce," "overseas air commerce" or "foreign air commerce," each being appropriately defined. 49 U. S. C. § 401 (20). All air carriers by similar procedures must obtain from the Board certifi-

cates of convenience and necessity by showing a public interest in establishment of the route and the applicant's ability to serve it. But when a foreign carrier asks for any permit, or a citizen carrier applies for a certificate to engage in any overseas or foreign air transportation, a copy of the application must be transmitted to the President before hearing; and any decision, either to grant or to deny, must be submitted to the President before publication and is unconditionally subject to the President's approval. Also the statute subjects to judicial review "any order, affirmative or negative, issued by the Board under this Act, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 801 of this Act." It grants no express exemption to an order such as the one before us, which concerns a citizen carrier but which must have Presidential approval because it involves overseas and foreign air transportation. The question is whether an exemption is to be implied.

This Court long has held that statutes which employ broad terms to confer power of judicial review are not always to be read literally. Where Congress has authorized review of "any order" or used other equally inclusive terms, courts have declined the opportunity to magnify their jurisdiction, by self-denying constructions which do not subject to judicial control orders which, from their nature, from the context of the Act, or from the relation of judicial power to the subject-matter, are inappropriate for review. Examples are set forth by Chief Justice Hughes in *Federal Power Commission* v. *Edison Co.,* 304 U. S. 375, 384. *Cf. Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 130.

The Waterman Steamship Corporation urges that review of the problems involved in establishing foreign air routes are of no more international delicacy or strategic importance than those involved in routes for water

carriage. It says, "It is submitted that there is no basic difference between the conduct of the foreign commerce of the United States by air or by sea." From this premise it reasons that we should interpret this statute to follow the pattern of judicial review adopted in relation to orders affecting foreign commerce by rail, *Lewis-Simas-Jones Co.* v. *Southern Pacific Co.,* 283 U. S. 654; *News Syndicate Co.* v. *New York Central R. Co.,* 275 U. S. 179, or communications by wire, *United States* v. *Western Union Telegraph Co.,* 272 F. 893, or by radio, *Mackay Radio & Telegraph Co.* v. *Federal Communications Commission,* 68 App. D. C. 336, 97 F. 2d 641; and it likens the subject-matter of aeronautics legislation to that of Title VI of the Merchant Marine Act of 1936, 46 U. S. C. § 1171, and the function of the Aeronautics Board in respect to overseas and foreign air transportation to that of the Maritime Commission to such commerce when water-borne.

We find no indication that the Congress either entertained or fostered the narrow concept that air-borne commerce is a mere outgrowth or overgrowth of surface-bound transport. Of course, air transportation, water transportation, rail transportation, and motor transportation all have a kinship in that all are forms of transportation and their common features of public carriage for hire may be amenable to kindred regulations. But these resemblances must not blind us to the fact that legally, as well as literally, air commerce, whether at home or abroad, soared into a different realm than any that had gone before. Ancient doctrines of private ownership of the air as appurtenant to land titles had to be revised to make aviation practically serviceable to our society. A way of travel which quickly escapes the bounds of local regulative competence called for a more penetrating, uniform and exclusive regulation by the nation than had been thought appropriate for the more easily controlled commerce of the past. While trans-

port by land and by sea began before any existing government was established and their respective customs and practices matured into bodies of carrier law independently of legislation, air transport burst suddenly upon modern governments, offering new advantages, demanding new rights and carrying new threats which society could meet with timely adjustments only by prompt invocation of legislative authority. However useful parallels with older forms of transit may be in adjudicating private rights, we see no reason why the efforts of the Congress to foster and regulate development of a revolutionary commerce that operates in three dimensions should be judicially circumscribed with analogies taken over from two-dimensional transit.

The "public interest" that enters into awards of routes for aerial carriers, who in effect obtain also a sponsorship by our government in foreign ventures, is not confined to adequacy of transportation service, as we have held when that term is applied to railroads. *Texas* v. *United States,* 292 U. S. 522, 531. That aerial navigation routes and bases should be prudently correlated with facilities and plans for our own national defenses and raise new problems in conduct of foreign relations, is a fact of common knowledge. Congressional hearings and debates extending over several sessions and departmental studies of many years show that the legislative and administrative processes have proceeded in full recognition of these facts.

In the regulation of commercial aeronautics, the statute confers on the Board many powers conventional in other carrier regulation under the Congressional commerce power. They are exercised through usual procedures and apply settled standards with only customary administrative finality. Congress evidently thought of the administrative function in terms used by this Court of another of its agencies in exercising interstate commerce power: "Such a body cannot in any proper sense be

characterized as an arm or an eye of the executive. Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control." *Humphrey's Executor* v. *United States,* 295 U. S. 602, 628. Those orders which do not require Presidential approval are subject to judicial review to assure application of the standards Congress has laid down.

But when a foreign carrier seeks to engage in public carriage over the territory or waters of this country, or any carrier seeks the sponsorship of this Government to engage in overseas or foreign air transportation, Congress has completely inverted the usual administrative process. Instead of acting independently of executive control, the agency is then subordinated to it. Instead of its order serving as a final disposition of the application, its force is exhausted when it serves as a recommendation to the President. Instead of being handed down to the parties as the conclusion of the administrative process, it must be submitted to the President, before publication even can take place. Nor is the President's control of the ultimate decision a mere right of veto. It is not alone issuance of such authorizations that are subject to his approval, but denial, transfer, amendment, cancellation or suspension, as well. And likewise subject to his approval are the terms, conditions and limitations of the order. 49 U. S. C. § 601. Thus, Presidential control is not limited to a negative but is a positive and detailed control over the Board's decisions, unparalleled in the history of American administrative bodies.

Congress may of course delegate very large grants of its power over foreign commerce to the President. *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294; *United States* v. *Bush & Co.,* 310 U. S. 371. The President also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs. For

present purposes, the order draws vitality from either or both sources. Legislative and Executive powers are pooled obviously to the end that commercial strategic and diplomatic interests of the country may be coordinated and advanced without collision or deadlock between agencies.

These considerations seem controlling on the question whether the Board's action on overseas and foreign air transportation applications by citizens are subject to revision or overthrow by the courts.

It may be conceded that a literal reading of § 1006 subjects this order to re-examination by the courts. It also appears that the language was deliberately employed by Congress, although nothing indicates that Congress foresaw or intended the consequences ascribed to it by the decision of the Court below. The letter of the text might with equal consistency be construed to require any one of three things: first, judicial review of a decision by the President; second, judicial review of a Board order before it acquires finality through Presidential action, the court's decision on review being a binding limitation on the President's action; third, a judicial review before action by the President, the latter being at liberty wholly to disregard the court's judgment. We think none of these results is required by usual canons of construction.

In this case, submission of the Board's decision was made to the President, who disapproved certain portions of it and advised the Board of the changes which he required. The Board complied and submitted a revised order and opinion which the President approved. Only then were they made public, and that which was made public and which is before us is only the final order and opinion containing the President's amendments and bearing his approval. Only at that stage was review sought,

and only then could it be pursued, for then only was the decision consummated, announced and available to the parties.

While the changes made at direction of the President may be identified, the reasons therefor are not disclosed beyond the statement that "because of certain factors relating to our broad national welfare and other matters for which the Chief Executive has special responsibility, he has reached conclusions which require" changes in the Board's opinion.

The court below considered, and we think quite rightly, that it could not review such provisions of the order as resulted from Presidential direction. The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry. *Coleman* v. *Miller,* 307 U. S. 433, 454; *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 319–321; *Oetjen* v. *Central Leather Co.,* 246 U. S. 297, 302.

We therefore agree that whatever of this order emanates from the President is not susceptible of review by the Judicial Department.

The court below thought that this disability could be overcome by regarding the Board as a regulatory agent of Congress to pass on such matters as the fitness, willingness and ability of the applicant, and that the Board's own determination of these matters is subject to review. The court, speaking of the Board's action, said: "It is not final till the Board and the court have completed their functions. Thereafter the completed action must be approved by the President as to citizen air carriers in cases under Sec. 801." The legal incongruity of interposing judicial review between the action by the Board and that by the President are as great as the practical disadvantages. The latter arise chiefly from the inevitable delay and obstruction in the midst of the administrative proceedings. The former arises from the fact that until the President acts there is no final administrative determination to review. The statute would hardly have forbidden publication before submission if it had contemplated interposition of the courts at this intermediate stage. Nor could it have expected the courts to stay the President's hand after submission while they deliberate on the inchoate determination. The difficulty is manifest in this case. Review could not be sought until the order was made available, and at that time it had ceased to be merely the Board's tentative decision and had become one finalized by Presidential discretion.

Until the decision of the Board has Presidential approval, it grants no privilege and denies no right. It can give nothing and can take nothing away from the applicant or a competitor. It may be a step which if erroneous will mature into a prejudicial result, as an order fixing valuations in a rate proceeding may foreshow and compel a prejudicial rate order. But admin-

istrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process. *United States* v. *Los Angeles & Salt Lake R. Co.,* 273 U. S. 299; *United States* v. *Illinois Central R. Co.,* 244 U. S. 82; *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 131. The dilemma faced by those who demand judicial review of the Board's order is that before Presidential approval it is not a final determination even of the Board's ultimate action, and after Presidential approval the whole order, both in what is approved without change as well as in amendments which he directs, derives its vitality from the exercise of unreviewable Presidential discretion.

The court below considered that after it reviewed the Board's order its judgment would be submitted to the President, that his power to disapprove would apply after as well as before the court acts, and hence that there would be no chance of a deadlock and no conflict of function. But if the President may completely disregard the judgment of the court, it would be only because it is one the courts were not authorized to render. Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government.

To revise or review an administrative decision which has only the force of a recommendation to the President would be to render an advisory opinion in its most obnoxious form—advice that the President has not asked, tendered at the demand of a private litigant, on a subject concededly within the President's exclusive, ultimate control. This Court early and wisely determined that it would not give advisory opinions even when asked by the Chief Executive. It has also been the firm and unvarying practice of Constitutional Courts to render no judgments

not binding and conclusive on the parties and none that are subject to later review or alteration by administrative action. *Hayburn's Case,* 2 Dall. 409; *United States v. Ferreira,* 13 How. 40; *Gordon* v. *United States,* 117 U. S. 697; *In re Sanborn,* 148 U. S. 222; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447; *La Abra Silver Mining Co.* v. *United States,* 175 U. S. 423; *Muskrat* v. *United States,* 219 U. S. 346; *United States* v. *Jefferson Electric Co.,* 291 U. S. 386.

We conclude that orders of the Board as to certificates for overseas or foreign air transportation are not mature and are therefore not susceptible of judicial review at any time before they are finalized by Presidential approval. After such approval has been given, the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate. This makes it unnecessary to examine the other questions raised. The petition of the Waterman Steamship Corp. should be dismissed.

*Judgment reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE REED and MR. JUSTICE RUTLEDGE concur, dissenting.

Congress has specifically provided for judicial review of orders of the Civil Aeronautics Board of the kind involved in this case. That review can be had without intruding on the exclusive domain of the Chief Executive. And by granting it we give effect to the interests of both the Congress and the Chief Executive in this field.

The Commerce Clause of the Constitution grants Congress control over interstate and foreign commerce. Art. I, § 8. The present Act is an exercise of that power. Congress created the Board and defined its functions. It specified the standards which the Board is to apply in granting certificates for overseas and foreign

air transportation.[1]   It expressly made subject to judicial review orders of the Board granting or denying certificates to citizens and withheld judicial review where the applicants are not citizens.[2]   If this were all, there would be no question.

But Congress did not leave the matter entirely to the Board.   Recognizing the important role the President plays in military and foreign affairs, it made him a participant in the process.   Applications for certificates of the type involved here are transmitted to him before hearing, all decisions on the applications are submitted to him before their publication, and the orders are "subject to" his approval.[3]   Since his decisions in these matters are of a character which involves an exercise of his discretion in foreign affairs or military matters, I do not think Congress intended them to be subject to judicial review.

But review of the President's action does not result from reading the statute in the way it is written.

---

[1] See §§ 401, 408 (b), 52 Stat. 987, 1001, 49 U. S. C. §§ 481, 488.

[2] Section 1006 (a) provides in part: "Any order, affirmative or negative, issued by the Board under this Act, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 801 of this Act, shall be subject to review by the circuit courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order."   52 Stat. 1024, 54 Stat. 1235, 49 U. S. C. § 646 (a).

Section 401 (a) requires every air carrier to have a certificate before engaging in air transportation.   52 Stat. 987, 49 U. S. C. § 481 (a). There is the same requirement in case of a foreign air carrier. § 402 (a), 52 Stat. 991, 49 U. S. C. § 482 (a).   An air carrier is defined as a citizen who undertakes to engage in air transportation [§ 1 (2), 52 Stat. 977, 49 U. S. C. § 401 (2)], and a foreign air carrier is defined as any person not a citizen who undertakes to engage in foreign air transportation. § 1 (19), 52 Stat. 978, 49 U. S. C. § 401 (19).

[3] § 801, 52 Stat. 1014, 49 U. S. C. § 601.

Congress made reviewable by the courts only orders "issued by the Board under this Act." [4]   Those orders can be reviewed without reference to any conduct of the President, for that part of the orders which is the work of the Board is plainly identifiable.[5]   The President is presumably concerned only with the impact of the order on foreign relations or military matters.   To the extent that he disapproves action taken by the Board, his action controls. But where that is not done, the Board's order has an existence independent of Presidential approval, tracing to Congress' power to regulate commerce.   Approval by the President under this statutory scheme has relevance for purposes of review only as indicating *when* the action of the Board is reviewable.   When the Board has finished with the order, the administrative function is ended. When the order fixes rights, on clearance by the President, it becomes reviewable.   But the action of the President does not broaden the review.   Review is restricted to the action of the Board and the Board alone.

The statute, as I construe it, contemplates that certificates issued will rest on orders of the Board which satisfy the standards prescribed by Congress.   Presidential approval cannot make valid invalid orders of the Board.   His approval supplements rather than supersedes Board action.   Only when the Board has acted within the limits of its authority has the basis been laid for issuance of certificates.   The requirement that a valid Board order underlie each certificate thus protects the President as well as the litigants and the public interest against unlawful Board action.

---

[4] § 1006 (a), *supra,* note 2.

[5] The Board had consolidated for hearing 29 applications for certificates to engage in air transportation which were filed by 15 applicants.   The President's partial disapproval of the proposed disposition of these applications did not relate to the applications involved in this case.   As to them, the action of the Board stands unaltered.

The importance of the problem is evidenced by the character of cases controlled by this decision. The present ruling is not limited to cases granting or denying certificates for air transportation to and from foreign countries. It also denies power to review orders governing air transportation between two points in Alaska, between two points in Hawaii, between Seattle and Juneau, between New Orleans and San Juan.[6] All of those are now beyond judicial review. And so they should be so far as conduct of the President is concerned. But Congress has commanded otherwise as to action by the Board. The Board can act in a lawless way. With that in mind, Congress sought to preserve the integrity of the administrative process by making judicial review a check on Board action. That was the aim of Congress, now defeated by a legalism which in my view does not square with reality.

In this petition for review, the respondent charged that the Board had no substantial evidence to support its findings that Chicago and Southern Air Lines was fit, willing and able to perform its obligations under the certificate; and it charged that when a change of conditions as to Chicago and Southern Air Lines' ability to perform was called to the attention of the Board, the Board refused to reopen the case. I do not know whether there is merit in those contentions. But no matter how substantial and important the questions, they are now beyond judicial review. Today a litigant tenders

---

[6] By § 801 the approval of the President extends to orders "authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession." 52 Stat. 1014, 49 U. S. C. § 601. Section 1 (21) includes in overseas air transportation commerce between a place in the continental United States and a place in a Territory or possession of the United States, or between a place in a Territory or possession of the United States and a place in any other Territory or possession. 52 Stat. 979, 49 U. S. C. § 401 (21).

questions concerning the arbitrary character of the Board's ruling. Tomorrow those questions may relate to the right to notice, adequacy of hearings, or the lack of procedural due process of law. But no matter how extreme the action of the Board, the courts are powerless to correct it under today's decision. Thus the purpose of Congress is frustrated.

Judicial review would assure the President, the litigants and the public that the Board had acted within the limits of its authority. It would carry out the aim of Congress to guard against administrative action which exceeds the statutory bounds. It would give effect to the interests of both Congress and the President in this field.

