**BRITISH AIRWAYS BOARD, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent.**

**No. 814, Docket 76–4226.**

United States Court of Appeals,
Second Circuit.

Argued April 5, 1977.
Decided Aug. 22, 1977.

William C. Clarke, New York City (Peter F. Vetro, New York City, of counsel), for petitioner.

James C. Schultz, Gen. Counsel, Civil Aeronautics Board, Washington, D.C. (Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Robert L. Toomey, David E. Bass, Attys., Civil Aeronautics Bd., Donald I. Baker, Asst. Atty. Gen., Carl D. Lawson, Joen Grant, Attys., Dept. of Justice, Washington, D.C., of counsel), for respondent.

Before OAKES, Circuit Judge, and WYZANSKI * and HOLDEN,** District Judges.

OAKES, Circuit Judge:

British Airways Board (British Airways), the United Kingdom's government-owned air carrier, petitions for review of three orders of the Civil Aeronautics Board (the Board or CAB). The first order, said to be in response to certain United Kingdom actions taken against American-owned carriers, required British Airways to file its existing schedules of service to and from the United States by September 28, 1976, and to file proposed schedules for any new or modified service thirty days before making the schedule changes. *In re the Schedules of Air VBI Limited*, Order 76–9–74, No. 29778 (CAB Sept. 14, 1976). The second order denied a stay of the first, schedule-filing order (except as to Washington-London Concorde service). Order 76–9–161 (Sept. 30, 1976). The third order was issued in response to a letter from President Ford to the CAB, dated October 9, 1976, in which the President stated that, because Britain and the United States had resolved their differences, "prompt rescission of the Board's [first or schedule-filing] order . . . would be appropriate and in the interests of our foreign policy." The CAB then vacated its earlier orders and terminated their effectiveness nunc pro tunc as of October 8, 1976. Order 76–10–110 (Oct. 26, 1976).[1] Because British Airways had not filed any schedules between September 28 and October 8, 1976, however, the Board indicated in the October 26 order that the airline would be subject to "enforcement liability" for that period. *Id.* at 3.[2]

A schedule-filing order such as the one under review may be required under 14

* Of the District of Massachusetts, sitting by designation.

** Chief Judge of the District of Vermont, sitting by designation.

1. Despite the CAB's vacation of these orders, at least the first of them remains before us because the petition for review as to it was filed prior to the CAB's vacation order, and the vacation order itself was explicitly made "subject to any necessary approval by the United States Court of Appeals for the Second Circuit." Order No. 76–10–110, at 4; *see id.* at n. 6.

2. During the pendency of this review proceeding, an administrative enforcement proceeding against British Airways was initiated by the CAB. The enforcement proceeding has been

C.F.R. § 213.3(c) (1975) when the CAB finds that the government of the holder of a foreign air carrier permit has taken action impairing or limiting an American air carrier's operating rights in the foreign country. When such an order is entered against a foreign air carrier, the carrier cannot make changes in equipment or in times or frequency of arrival and departure for thirty days, *see id.* § 213.3(b). The CAB can also issue a schedule-limitation order that limits the number of flights the subject airline can make to or from the United States, with the order expressly subject to "stay or disapproval by the President of the United States within 10 days after adoption . . . ," *id.* § 213.3(d). Here an order limiting petitioner's United States schedules was issued by the CAB on September 29, 1976. The October 9 letter of the President to the CAB referred to above was issued in response to this schedule-limitation order and disapproved it within the requisite ten-day period, *id.* The letter then went on to refer to the schedule-filing order here under review.[3]

This court's jurisdiction to review these orders is premised on 49 U.S.C. § 1486. That section makes reviewable in the courts of appeals "[a]ny order . . . issued by the Board . . ., except any order in respect of any foreign air carrier subject to the approval of the President as provided in [*id.* § 1461] . . . ." Insofar as here rele-

vant, Section 1461 requires that presidential approval be obtained whenever the CAB desires to amend or otherwise modify a foreign air carrier's operating permit or certificate. Thus, if the CAB's schedule-filing directive to British Airways were considered an amendment of the carrier's permit, advance presidential approval, which was not obtained, would have been required, and this court would be without jurisdiction to review the orders.

█ We believe that the orders here involved did not amend British Airways' permit. In 1970, by an order approved by the President, the Board amended the permits of 48 foreign carriers, including that of British Airways' corporate predecessor, to make the permits subject to the provisions of certain regulations adopted on the same date. It was under these regulations, 14 C.F.R. §§ 213.1–.6 (1975), that the Board issued its schedule-filing directive in the instant case. The directive thus amounted to implementation of a previously approved condition and did not modify British Airways' permit. An implementation effort of this nature does not require separate presidential approval. *Dan-Air Services, Ltd. v. CAB*, 154 U.S.App.D.C. 297, 475 F.2d 408, 412 (1973) (per curiam). Therefore this court has jurisdiction to review the orders before us.[4]

---

stayed by agreement of the parties. According to the CAB's third order, British Airways is to be held liable only for its failure to file existing schedules; no liability for failure to file proposed schedules is contemplated. *See id.* at 3 & n. 5.

3. The letter from the President provides in full (emphasis added):

THE WHITE HOUSE
Washington
October 9, 1976

Dear Mr. Chairman:
I have reviewed the Board's proposed order in the matter of the schedules of British Airways Board (British Airways) in Docket 29778 and the circumstances surrounding that order. In view of the fact that the issues necessitating the actions proposed in the order have been satisfactorily resolved with the British authorities, I am hereby disapproving the order.

*I have further determined that prompt rescission of the Board's order 76–9–74, which requires the carrier to file with the Board its existing and proposed schedules, would be appropriate and in the interests of our foreign policy.*
Respectfully,
s/ Gerald R. Ford .
The Honorable John E. Robson
Chairman
Civil Aeronautics Board
Washington, D. C. 20428

4. The scope of review is governed by Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(e), which provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

■ The fact that the CAB did not have to obtain presidential approval before it ordered British Airways to file schedules, however, does not mean that it was free as a matter of law to ignore the disapproval embodied in the presidential letter of October 9 relative to the schedule-filing order under review, *see* note 3 *supra.* The Board recognized this by largely deferring to the President's wishes and vacating its schedule-filing order nunc pro tunc as of October 8, 1976. But at the same time it insisted that it was acting as "an independent agency," and to show its independence it decided to hold British Airways liable for its failure to file existing schedules in the September 28–October 8 period, though, "to strike a balance," not for failure to file proposed schedules thirty days in advance, *see* note 2 *supra.* We believe that the Board's insistence on its independence in this matter represents a misunderstanding of its role with regard to foreign air carriers and of the extent of presidential primacy on issues related to foreign affairs. We accordingly set aside the orders.

■ In *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), the Supreme Court discussed the "inver[sion] [of] the usual administrative process" that Congress intended when it made CAB decisions relating to foreign air carriers subject to presidential approval:

> Instead of acting independently of executive control, the agency is . . . subordinated to it. Instead of its order serving as a final disposition . . ., its force is exhausted when it serves as a recommendation to the President. . . Presidential control is not limited to a negative but is a positive and detailed control over the Board's decisions, unparalleled in the history of American administrative bodies.

*Id.* at 109, 68 S.Ct. at 434.[5] A necessary implication of the President's "positive and detailed control" under the statute, we believe, is the power to disapprove particular actions taken by the Board under broad regulations that the President has previously approved. *Cf. Trans World Airlines, Inc. v. CAB,* 184 F.2d 66, 71 (2d Cir. 1950) (power of President to withdraw approval), *cert. denied,* 340 U.S. 941, 71 S.Ct. 504, 95 L.Ed. 679 (1951). Were this power lacking, presidential approval of broad regulations would in effect give the CAB carte blanche in an area in which Congress has quite clearly indicated that the President, not the CAB, is supreme. It is in an area of foreign policy, moreover, in which the President's decisions, to use Mr. Justice Jackson's words for the Supreme Court, "are delicate, complex, and involve large elements of prophecy." 333 U.S. at 111, 68 S.Ct. at 436. In such an area, an agency of the United States Government, even if independent for other purposes, is subordinated to executive control "[i]nstead of acting independently . . . .," 333 U.S. at 109, 68 S.Ct. 431, at least when the Chief Executive has been given positive and detailed control by the Congress. *See Chicago & Southern Air*

---

. . . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
  (B) contrary to constitutional right, power, privilege, or immunity;
  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

. . . . .

5. The *Chicago & Southern* holdings with regard to ripeness and judicial review have been limited and criticized by certain courts and commentators. *See, e. g., Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 516 F.2d 594, 622–23 (1975) (en banc) (plurality opinion of Wright, J.); *Air Line Pilots' Ass'n International v. Department of Transportation,* 446 F.2d 236, 240–41 (5th Cir. 1971); *Pan American World Airways, Inc. v. CAB,* 129 U.S.App.D.C. 159, 392 F.2d 483, 492–93 (1968); *Pan American World Airways, Inc. v. CAB,* 380 F.2d 770, 775–76 (2d Cir. 1967), *aff'd by equally divided Court sub nom. World Airways, Inc. v. Pan American World Airways, Inc.,* 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968); Miller, *The Waterman Doctrine Revisited,* 54 Geo.L.J. 5 (1965). None of these limitations or criticisms, however, is directed at the portion of *Chicago & Southern* quoted in text, which involves the President's statutory powers over CAB decisions affecting foreign air carriers.

*Lines, Inc. v. Waterman Steamship Corp., supra*, 333 U.S. at 109–10, 68 S.Ct. at 435 (President is "the Nation's organ in foreign affairs"; his powers and those of Congress are "pooled" in this area "to the end that commercial strategic and diplomatic interests of the country may be coordinated and advanced without collision or deadlock between agencies"); *In re British Overseas Airways Corp. Permit Amendment*, 29 C.A.B. 583, 594 (1959) (CAB cannot be equated with U.S. Government with regard to foreign carriers; there is a "division of functions," with the President making the final decision for the Government).

Once it is accepted that the CAB must take the President's word as supreme in a case of this nature, it follows that the Board's orders here under review must be set aside. The Board itself recognized that it was not following the President when, in its third order, which vacated the first two but preserved a basis for enforcement liability, it explicitly stated that the Board's deference to presidential wishes "will not be unqualified." Order No. 76–10–110, *supra*, at 2. The President's letter to the Board, moreover, although not phrased as a directive, could not be more clear as to the action that the President had "determined" to be "appropriate and in the interests of our foreign policy." *See* note 3 *supra*.

■ That this determination was embodied in a letter issued in response to the Board's schedule-limitation order of September 29, 1976, reinforces the view that the President was exercising his full prerogative in the area and demonstrates the importance of the schedule-filing order in the overall settlement of the then-current dispute between the United States and Great Britain. The only action required of the President under the regulations was approval or disapproval of the schedule-limitation order; by inclusion of the reference to the schedule-filing order, the President made it clear that he was exercising the full extent of his presidential control. The "prompt rescission" that the President called for is not anywhere suggested to be a partial rescission, and the common meaning of the verb "rescind," at least in law, involves declaring something (usually a contract) abrogated from its inception, so that the parties are restored to the positions they would have occupied had no action been taken initially, *see Black's Law Dictionary* 1471 (4th ed. 1951). Rescission in this sense has been denied British Airways by the CAB's preservation of a basis for enforcement liability, contrary to the express determination of the President.[6]

We therefore set aside the Board's orders. Because we have concluded that the orders improperly ignored a presidential directive,

---

**6.** If there were any doubt as to the President's intention, it is resolved by tracing the underlying advisory memoranda. At our request the Department of Justice, on behalf of the Counsel to the President, the Department of State, and the Justice Department's Office of Legal Counsel, furnished the court with memoranda pertaining to the draft of the President's letter of October 9. This material is short and simple. The Department of State wrote the Office of Management and Budget on October 8, 1976. It pointed out that, in view of the satisfactory solution worked out with the British, the basis for the issuance of the schedule-filing order under review was "no longer valid," and that "withdrawal of the order has substantive importance, since the requirement . . . significantly reduces the scheduling flexibility of [the British] airlines." State therefore recommended that the President's letter "strongly urge the CAB to withdraw its order 76–9–74 of September 14, 1976."

The Office of Management and Budget's "Memorandum for the President," also dated October 8, points out that "State . . . recommends that you advise the Board that recission [sic] of its September 14, 1976, order is appropriate and in our foreign policy interests." It goes on to note: "In view of the foreign policy issues inherent in this case, the interested executive agencies defer to the recommendations of the Department of State. The National Security Council concurs with the Department of State recommendation." The final draft of the letter expressly used the term "rescission," *see* note 3 *supra*, which carries with it, we think a definite retroactive meaning of significance, as discussed in the text. Rather than "strongly urge" the agency, as State had suggested, which would imply a power in the Board of independent action, the final draft pointedly uses the terminology, "I have . . . determined," which is consistent with an exercise of presidential prerogative, not subject to independent action by the agency.

made in the exercise of his statutory and constitutional powers, we need not reach the other attacks on the orders made by British airways.

Petition for review granted. Orders set aside in accordance with opinion.