December 21, 1979

## 79-87   MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

### Federal Aviation Act—Foreign Air Transportation—Scope of Presidential Authority on Review of Civil Aeronautic Board's Approval of Airline Mergers (49 U.S.C. § 1461)

This is in response to a request for an opinion on the President's authority under § 801 of the Federal Aviation Act, as amended by the Airline Deregulation Act, 49 U.S.C. § 1461, to review the order of the Civil Aeronautics Board (the Board) in the *Pan American-Acquisition of Control of, and Merger with, National Case* (Docket 33283). The Board approved a merger between Pan American World Airways ("Pan Am") and National Airlines ("National"), as well as the transfer to Pan Am of National's certificates, including National's certificates to engage in foreign air transportation. The only foreign route excepted from the approval was National's Miami-to-London route. You have asked us what the President's legal options are in reviewing the Board's order and more specifically whether the President has the authority to award the Miami-to-London route to Pan Am.

Several conclusions emerge from our consideration of this matter. First, the President does not have the authority under the statute to order the Board affirmatively to award the Miami-to-London route to Pan Am. Second, because the Board's deletion of the Miami-to-London route appears to be inextricably related to its approval of the merger and of the transfer of National's certificates, the President cannot reinstate the route by disapproving only the deletion of the route. Moreover, even if the President could reinstate the Miami-to-London route in the certificates transferred to Pan Am by disapproving the deletion, it is possible that the Board may have the authority thereafter to reconsider its order and deny Pan Am's merger application as well as the transfer of National's certificates to Pan Am. Third, we have also concluded that the Department of State has articulated a foreign relations concern on which the President

may rely to justify a disapproval of the deletion of the Miami-to-London route under § 801, should he decide to rely upon it. We have pointed out, however, that the President can satisfy the Department of State's articulated foreign relations concern if he takes no action on the Board's merger order and reviews instead the Board's forthcoming selection of a carrier to service that route in the *Miami-London Case,* which is now pending before the Board.

## I.

Under § 801 of the Federal Aviation Act, as amended by the Airline Deregulation Act of 1978, 49 U.S.C. § 1461,[1] the Board's issuance, denial, transfer, amendment, cancellation, suspension, or revocation of a certificate to engage in foreign air transportation and the terms, conditions and limitations contained in such certificates must be presented to the President for review. The President has the right to disapprove any such Board action "solely upon the basis of foreign relations or national defense considerations which are within the President's jurisdiction, but not upon the basis of economic or carrier selection considerations," 49 U.S.C. § 1461(a).[2] The President's disapproval renders the Board's action null and void.

At the outset, it is necessary to identify the Board's actions in this case which are subject to Presidential review under § 801. In its order, the Board approved[3] the application of Pan American World Airways, Inc., for acquisition of control of and merger with National Airlines, Inc., and the transfer to Pan American of the certificate of public convenience and necessity issued to National for its international routes with the exception

---

[1]The provision of § 801, as codified, reads as follows:

(a) The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in any certificate authorizing an air carrier to engage in foreign air transportation, or any permit issuable to any foreign air carrier under 1372 of this title, shall be presented to the President for review. The President shall have the right to disapprove any such Board action concerning such certificates or permits solely upon the basis of foreign relations or national defense considerations which are within the President's jurisdiction, but not upon the basis of economic or carrier selection considerations. Any such disapproval shall be issued in a public document, setting forth the reasons for the disapproval to the extent national security permits, within sixty days after submission of the Board's action to the President. Any such Board action so disapproved shall be null and void. Any such Board action not disapproved within the foregoing time limits shall take effect as action of the Board, not the President, and as such shall be subject to judicial review as provided in section 1486 of this title.

[2]The question whether the President has grounds to disapprove the Board's order is discussed in the next section of this opinion.

[3]The Board approved the merger and transfer subject to the conditions that Pan Am accept certain labor-protective conditions and agree to operate the Miami-to-London route until another carrier is selected by the Board. On October 1, 1979, the Board instituted proceedings to hear applications for the Miami-to-London route. *Miami-London Case* (Docket 36764).

of National's Miami-to-London authority. Because National's certificates authorize it to engage in foreign air transportation, the transfer of those certificates is clearly subject to Presidential review. Under the case law, the merger approval, because it is inextricably linked to the transfer of certificates, has also been viewed as subject to Presidential review under § 801(a). *Trans World Airlines* v. *Civil Aeronautics Board,* 184 F. (2d) 66, 71 (2d Cir. 1950). It could also be reasonably argued that the deletion of the Miami-to-London route from the certificate for Route 168 may be viewed as an "amendment" to the transferred certificate and, as such, also subject to Presidential review as a separate Board action.[4] However, the Board's deletion of the route appears to be inextricably related to its approval of the merger and of the transfer of the certificates.[5] For that reason, we believe that the Board's actions should be viewed as a single Board action under § 801, which the President may either disapprove or approve by expressing no disapproval.

If the President were to adopt the view that the Board's actions are reviewable separately under § 801, it is unlikely that the President could effectively reinstate the deleted route by disapproving the "amendment" and expressing no disapproval of the transfer and the merger. From the order, it is apparent that the Board regarded its approval of the merger and transfer as conditioned on the deletion of the Miami-to-London route.[6] The Board may argue that without the fulfillment of that condition there is no Board approval of the transfer and merger and therefore no reviewable Board actions concerning the transfer and merger.

Alternatively, the Board could maintain that under § 801(a) the transfer and merger not disapproved by the President are not actions of the President but rather Board actions and as such may be reconsidered by the Board either *sua sponte*[7] or upon petition for reconsideration by a party to

---

[4]The Board states in its opinion that it is deleting the Miami-to-London route. As a footnote to that statement, it mentions that the certificate for Route 168 had been amended several times before. Majority Opinion at 52, n. 135.

[5]The Board also apparently viewed its deletion of the Miami-to-London route from National's certificates and its approval of the merger and of the transfer of National's certificates as inextricably related. In its order in the *Miami-London Case* (Docket 36764), the Board states:

Absent the condition that Miami-London authority not be transferred, we would not approve the Pan American-National merger. [Order at 1.]

Our conclusion that the Board's order constitutes a single inseverable Board action for the purpose of Presidential review under § 801 is based on the interrelationship among the merger, transfer, and amendment decisions and not on the basis that all three decisions were included in one order. We do not foreclose the possibility that there may be instances in which the Board may include in one order actions that could be considered severable and thus separately subject to Presidential disapproval.

[6]The Board mentions twice in its opinion that its approval of the transfer is conditioned on the deletion of the Miami-to-London route. Majority Opinion 7, 64. *See also* its order in the *Miami-London Case* at 1. (Docket 36764.)

[7]Except as otherwise provided in this chapter the Secretary of Transportation or the Board is empowered to suspend or modify their orders upon such notice and in such manner as they shall deem proper. [49 U.S.C. § 1485(d).]

472

the proceeding.[8] As support for such an argument, the Board could point to § 801(a)'s provision that "[a]ny such Board action not disapproved within the foregoing time limits shall take effect as action of the Board, not the President, and as such shall be subject to judicial review as provided in section 1006 of this Act." If § 801(a) was intended to treat Board actions not disapproved by the President as actions of the Board for all purposes, an argument that the transfer and merger actions may be reconsidered would have some merit. From the face of the statute,[9] however, it is apparent that the purpose of treating actions not disapproved by the President as Board actions was to overcome the reluctance of the courts to review Presidential decisions under the former § 801(a).[10] Thus, it could be argued that Board actions reviewed and not disapproved by the President are treated as Board actions under § 801(a) only for the purpose of ensuring judicial review and that § 801(a) does not permit the Board under the guise of reconsideration to review Presidential decisions.[11] Given these uncertainties and the Board's threat to disapprove the merger if the President attempts to reinstate the Miami-to-London route, we doubt that, even if the Board's actions were viewed separately, the President would succeed in reinstating the Miami-to-London route.

Nor do we believe that the President could reinstate the route by ordering the Board to do so. The argument suggesting this course of action relies upon case law construing § 801(a) prior to its amendment by the Airline Deregulation Act. For this reason, the argument has no merit. Section 801(a) prior to amendment[12] required that the transfer of certificates

---

[8]Any party to a proceeding, unless an order or rule of the Board specifically provides otherwise, may file a petition for reconsideration, rehearing or reargument of (1) final orders issued by the Board. [14 CFR § 302.37.]

[9]The legislative history of the Airline Deregulation Act does not discuss the purpose of treating action not disapproved by the President as Board action.

[10]*Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.*, 333 U.S. 103 (1948) (absent clear congressional intention, judicial review should be unavailable).

[11]If the Board were permitted to reconsider the decision to transfer and it disapproved the transfer, its disapproval would have to be submitted to the President under § 801(a) for review. *Trans World Airlines* v. *Civil Aeronautics Board,* 184 F. (2d) 666, 70-71 (2d Cir. 1950). The President could then disapprove the Board's disapproval, and the Board's disapproval would under § 801(a) become null and void. It is not clear what would be the status at that point of Pan Am's application for merger and transfer, but, since the Board's action would be a nullity, Pan Am's application would probably be considered as pending before the Board and the whole process would begin again.

[12]Section 801(a), prior to amendment by the Airline Deregulation Act, provided:

The issuance, denial, transfer, amendment, cancellation, suspension, revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. Copies of all applications in respect of such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be submitted to the President before application thereof. (72 Stat. 782 (1958).)

473

to engage in foreign air transportation be subject to the approval of the President. In *Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.,* 333 U.S. 103 (1948), the Supreme Court interpreted this power of review very broadly:

> *Nor is the President's control of the ultimate decision a mere right of veto.* It is not alone issuance of such authorizations that are subject to his approval, but denial, transfer, amendment, cancellation, or suspension as well. And likewise subject to his approval are the terms, conditions and limitations of the order. 49 U.S.C. § 601. *Thus, Presidential control is not limited to a negative but is a positive detailed control over the Board's decisions unparalleled in the history of American administrative bodies. [Id.* at 109. (Emphasis added.)]

Relying on this interpretation of former § 801, Presidents have ordered the Board to rewrite its orders to select carriers and otherwise to revise its orders to make them acceptable to the President.[13]

Section 801(a), as amended by the Airline Deregulation Act, still requires that the issuance, denial, transfer, amendment, cancellation or suspension be presented to the President for his review. That review, however, has now been circumscribed. The statute makes clear that the President is limited to disapproving Board actions and, therefore, unlike the former § 801(a), he is given a "mere right of veto." *Id.* at 109. This limitation does not preclude the President from exercising his veto in such a way that he indirectly retains some control over the Board's decision. For instance, the President may disapprove the Board's entire action in this case and make it clear that he will continue to disapprove a merger between Pan Am and National unless the Miami-to-London route is transferred to Pan Am. *Cf., Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 652–54 (1978).[14] Of course, the Board then has the option of disapproving the merger and transfer entirely, but it should be remembered that the Board's disapproval is subject to Presidential review, and may be disapproved. To break the stalemate, the Board may choose to submit an order acceptable to the President, rather than submit another disapproval of the merger to the President for his review.

## II.

As mentioned above, the President may disapprove a Board action under § 801(a) "solely upon the basis of foreign relations or national defense considerations which are within the President's jurisdiction, but not upon the basis of economic or carrier selection grounds." 49 U.S.C.

---

[13]*See, e.g.,* President Carter's action in the *Transatlantic Route Proceeding* (Docket 25908).

[14]In *Trans Alaska,* the Supreme Court held that the Interstate Commerce Commission, although it had no express power to prescribe interim rates, could, in suspending a rate, indicate the maximum interim tariff which it would not suspend.

§ 1461(a). If read narrowly, § 801(a) would permit the President to disapprove on foreign relations or national defense grounds only when those grounds did not include economic or carrier selection considerations. Under this interpretation, the President would be precluded from disapproving the Board's selection of a particular carrier even if such selection would have a significant adverse effect on foreign relations. We believe that such an interpretation is not consistent with the purpose of the statute. In explaining the purpose of the amendments to § 801, the House Report states:

> Section 801 of the Federal Aviation Act does not impose any specific standards for the President to follow in reviewing decisions of the CAB on international air routes. *From time to time questions have arisen as to whether this section permits the President to substitute his judgment for that of the CAB as to which routes will best serve the interests of the traveling public. The committee believes that this type of judgment should be made by the CAB which is an arm of Congress and that the President should only disapprove CAB decisions when the decision would create difficulties in our foreign relations or national security.* Accordingly, H.R. 12611 provides that the President may disapprove CAB international route decisions only on the basis of foreign relations or national defense considerations and that the President may not disapprove CAB decisions on economic grounds or carrier selection grounds. [H. Rept. 95–1211, 95th Cong., 2d sess. at 19 (1978). (Emphasis added.)]

From the foregoing passage, it is apparent that Congress limited the grounds upon which the President could disapprove Board actions in order to preclude the President from second-guessing the Board's decision as to what action would best serve the interests of the traveling public. The legislative history reveals no intention to confine the scope of the President's authority to disapprove Board action on foreign relation or national security grounds to situations in which these considerations did not encompass economic or carrier selection issues. To infer such an intention would run counter to the established principle that when the President acts under a legislative grant in the area of foreign relations or national security, his powers should be construed broadly. *United States* v. *Curtiss-Wright Corp., 299 U.S. 304, 318–22 (1936).* It is apparent that a requirement that the President's power to act arise only where his foreign affairs concerns have no economic or carrier selection aspects would significantly restrict the President's prerogative to act. Those knowledgeable about the issues that ordinarily arise in the review of these types of CAB decisions would agree that most sensitive international air transportation decisions have aspects both of foreign relations and economic or carrier selection considerations. In the absence of a clear expression from Congress that it intended to restrict the President in this way, we see no basis for so limiting his authority.

475

The Department of State, although noting it had no objection to the Board's order, has indicated in its letter to the Office of Management and Budget that withholding the Miami-to-London route from Pan Am may create difficulties with Great Britian. According to the Department of State, Great Britain has indicated that it will not permit any American carriers not presently serving Heathrow Airport to start service at Heathrow and that such carriers must fly into Gatwick Airport. The Department of State believes that because Pan Am presently serves Heathrow, Great Britain would permit Pan Am to fly from Miami into Heathrow Airport. If a replacement carrier is selected, the British may deny such carrier the facilities at Heathrow and insist that it fly into Gatwick instead. A dispute may then arise between the United States and Great Britain as to the rights of American carriers under Bermuda II. The Department of State believes that "the issue could become extremely abrasive, with possible adverse consequences for our efforts to gain broad liberalization of the present U.S.-UK Civil Aviation agreement." Letter dated November 19, 1979, from Julian L. Katz, Assistant Secretary for Economic and Business Affairs, Department of State, to James T. McIntyre, Jr., Director, Office of Management and Budget.

The concern that a dispute may arise between Great Britain and the United States if a replacement carrier for the Miami-to-London route cannot fly into Heathrow Airport appears on its face to provide a basis for an assertion by the President that withholding that route from Pan Am will create difficulties in foreign relations. Because of the deference the courts have traditionally accorded to the President when he acts as the Nation's organ of foreign policy, his determination would most likely be accepted on its face by the courts. *United States* v. *Curtiss-Wright Corp.,* 299 U.S. at 319–21; *Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.,* 333 U.S. at 111.

Nevertheless, we believe that, in the light of § 801(a)'s requirement that the President state in a public document the reasons for disapproving a Board action, the President should be aware of a weakness we perceive in this foreign relations argument. To our knowledge Pan Am is not the only American carrier that presently serves Heathrow. Even if the British insist that no new carriers may serve Heathrow, a dispute may not arise if the replacement carrier selected by the Board also presently serves Heathrow. Thus, whether a foreign relation problem may arise will be known only after the Board has selected a carrier for that route.[15] If the Board selects a carrier that does not presently serve Heathrow, the President may disapprove that Board action on the ground that he does not want to create a

---

[15]The Board has commenced proceedings to select a replacement carrier for the Miami-to-London route. *Miami-London Case* (Docket 36764). The Board's order approving the merger between Pan Am and National requires Pan Am to operate the route until a carrier is finally selected.

conflict with the British by demanding that the replacement carrier be permitted to fly into Heathrow. His reasons would give a signal to the Board to select a carrier that presently serves Heathrow and the President's articulated foreign relations concerns could, presumably, ultimately be satisfied.

## Conclusion

In our view, the President does not have the power under § 801(a) to reinstate the Miami-to-London route or to order the Board to do so. Because the Board's merger, transfer, and amendment decisions are inextricably related, the President may not disapprove only the amendment. The President does have the power to disapprove the entire Board action and may justify disapproval on the ground that withholding the Miami-to-London route from Pan Am will create difficulties in our relations with Great Britain.[16]

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[16]Your Office asked us also to comment briefly on some other proposed reasons for disapproving the Board's action. The first suggestion is that the Board's concern that Pan Am's operation of the Miami-to-London route would be anticompetitive will be groundless when Bermuda II is liberalized to permit more American carriers to fly into Great Britain. In our opinion, this reason merely criticizes the Board's economic analysis and does not provide a ground for asserting that the deletion of the route will create difficulties in foreign relations or national security. Another suggested ground for disapproval is that the President has a foreign policy of maintaining a strong national carrier and that awarding the Miami-to-London route to Pan Am will accomplish that policy. Again we do not perceive the nexus between maintaining Pan Am as a strong carrier and § 801's standard for disapproval— whether the Board's action will create difficulties in foreign relations or national security. Finally, it has been suggested as a national defense consideration that Pan Am must be maintained as a financially viable carrier so that it is available to airlift American citizens out of troubled areas. We are not sufficiently knowledgeable about the state of the international air travel industry, or about the practical need to preserve Pan Am as a "viable" entity, to comment on this argument.