**CHASER SHIPPING CORPORATION, and Den Norske Krigsforsikring for Skib, gjensidig forening (The Norwegian War Risk Insurance for Ships, A Mutual Association), Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 86 Civ. 2500 (CHT).

United States District Court, S.D. New York.

Dec. 11, 1986.

Healy & Baillie, Hill, Betts & Nash, New York City, for plaintiffs; Gordon W. Paulsen, Elisa M. Pugliese, Henry F. White, Jr., of counsel.

Richard K. Willard, Asst. Atty. Gen., Rudolph W. Giuliani, U.S. Atty., Gary W. Allen, Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant; E. Page Moffett, Office of General Counsel, Central Intelligence Agency, of counsel.

TENNEY, District Judge.

The plaintiffs in this action, Chaser Shipping Corporation (herein called "Chaser"), owner of the M/T IVER CHASER, and Den Norske Krigsforsikring for Skib, gjensidig forening (The Norwegian War Risk Insurance for Ships, A Mutual Association) (herein called "Den Norske"), two foreign corporations, seek to recover over $1.6 million in damages from defendant United States of America ("Government"). The injury for which plaintiffs seek redress occurred on March 28, 1984, in the Nicaraguan harbor of Corinto. The IVER CHASER, loaded with a cargo of molasses and benzine destined for delivery to the State of Texas, struck a mine in the harbor which caused extensive damage to her hull. Complaint, ¶¶ 15, 18. Den Norske paid Chaser for the damage to the ship pursuant to a prior agreement and asserts that it is subrogated to that extent to the rights and claims of Chaser. Complaint, ¶ 4. Plaintiffs' complaint further alleges that the Central Intelligence Agency ("CIA"), with the approval of the President, manufactured the mines and supervised and directed their placement, and that it carried out these acts in a negligent, malicious or wanton manner. Complaint, ¶¶ 8–10. Plaintiffs seek to recover under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 742 (1975) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) (1976) and §§ 2671–2680 (1965 and Supp. 1986).

The Government moves to dismiss plaintiffs' complaint on three grounds: (i) lack of subject matter jurisdiction; (ii) failure to state a claim upon which relief can be granted; and (iii) improper venue. Fed.R. Civ.P. 12(b)(1), (3) and (6). For the purpose of ruling on the present motion, the Court accepts the truth of the allegations in plaintiffs' complaint that the IVER CHASER was damaged by a mine, which was manufactured or whose placement was supervised and directed, by the CIA with the

approval of the President. In addition to the pleadings, the parties have submitted both briefs and affidavits to the Court. Plaintiffs' submission includes various news articles summarizing information known to the public concerning the placement of mines in Nicaragua's harbors, with particular emphasis on the involvement of the President and the CIA in such operations. These articles state that the White House, CIA and State Department all disclaimed responsibility for the mining in the early months of 1984. Plaintiffs hope to recover their damages on the theory that the Government violated a duty to innocent third-party vessels by failing to comply with its previously established practice of clearly warning such parties that mines had been placed in the harbor. Brief for plaintiffs at 15. The Government contends that the plaintiffs' action raises a nonjusticiable political question, reasoning that the Constitution vests the Executive and Legislative branches with power to conduct foreign relations and thus it would violate the principle of separation of powers "for this Court to subject the high-level CIA and Presidential activities alleged by Plaintiffs in the complaint to the kind of judicial analysis required for determinations of negligence and proximate causation in tort." Reply Brief for the Government at 2. The Court agrees with the Government that plaintiffs' complaint seeks adjudication of nonjusticiable political questions. Accordingly, the Government's motion is granted and plaintiffs' complaint is dismissed.[1]

## DISCUSSION

The undisputed starting point in any court's analysis of a purported political question issue is the Supreme Court's oft-quoted elucidation of that doctrine in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

---

1. The Government asserts two additional grounds for dismissal apart from the political question doctrine: (i) lack of jurisdiction under the FTCA and SIAA, and (ii) improper venue under the FTCA. In view of the Court's conclu-

sion that plaintiffs' complaint raises nonjusticiable political questions, it is unnecessary to consider the other grounds raised in support of the motion to dismiss.

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217, 82 S.Ct. at 710.

The Court then proceeded to note that the implication of any one of these concerns in a case would render it nonjusticiable. However, the Court added that it is necessary to make a careful inquiry as to the precise facts and posture of the case at issue before drawing any conclusions as to its justiciability. Id. This Court has conducted such an inquiry and concludes that several of the concerns raised by the Baker opinion will be implicated if the present claim for relief is adjudicated.

The plaintiffs correctly note that the Judiciary is responsible for adjudicating claims of tort liability asserted against the Government. See Greenham Women against Cruise Missiles v. Reagan, 591 F.Supp. 1332, 1336 (S.D.N.Y.1984), aff'd, 755 F.2d 34 (2d Cir.1985). However, the Constitution commits to the Executive Branch the authority to make foreign policy decisions. Plaintiffs apparently believe that by framing an action which seeks damages under the FTCA and SIAA, but which does not seek to enjoin or declare unconstitutional the actions of the President or the CIA, they are not asking the Court to interfere in the domain of the Executive Branch. Similar claims of tort liability were asserted against the United States with regard to the events that preceded the shooting down of Korean Air Lines Flight 007 over the Sea of Japan. See In re Korean Air Lines Disaster of September 1, 1983, 597 F.Supp. 613 (D.D.C.1984) (appeal docketed). The plaintiffs in Korean Air Lines alleged that the Government's (i) deployment of military aircraft near Flight 007; (ii) failure to track the flight and (iii) failure to warn the crew of the flight's departure from course constituted tortious conduct. The court dismissed these claims, stating:

> To attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the executive branch.... Whatever the facts and circumstances surrounding the executive decision to conduct reconnaissance activity over the waters adjacent to the Soviet Union, the method and manner of that decision may not be inquired into by the courts.

597 F.Supp. at 616–17.

Here, as in Korean Air Lines, the fact that plaintiffs seek damages and not an injunction does not mitigate separation of powers concerns. Even though awarding tort damages is a traditional function for the judiciary, it is apparent that there is a clear lack of judicially discoverable and manageable standards for arriving at such an award. The Court simply does not agree with plaintiffs that an inquiry into the issues of tort liability raised by their complaint would be a manageable one. The complaint reveals that this is an action by two foreign entities seeking damages for injuries suffered in foreign waters due to covert mining operations conducted there by the Executive Branch. The precise nature of the claim is that plaintiffs' injuries could have been avoided if the CIA and/or the President had conducted the mining operations with due care. The plaintiffs ask the Court to hold that, once the CIA and/or the President have established a practice of warning innocent third parties of the possible commencement of covert military operations in an area, an enforceable duty to adhere to such practice

arises. Breach of that duty would require the Government to provide monetary redress to innocent third parties injured during the operations. It is apparent that inquiries concerning such alleged breaches could not be conducted without obtaining classified intelligence documents relating to the covert operations. Plaintiffs will be unable to obtain the classified documentary evidence necessary to support their claim as it will certainly not be provided voluntarily and is clearly exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b)(1)(A) (1977) as secret national defense or foreign policy information. *See Peterzell v. CIA*, No. 85–2685, slip op. at 1 (D.D.C. July 11, 1986) [Available on WESTLAW, DCTU database]; *Sanchez-Espinoza v. Reagan*, 568 F.Supp. 596, 600 (D.D.C.1983), *aff'd on other grounds*, 770 F.2d 202 (D.C.Cir.1985). Even if plaintiffs were accorded access to intelligence documents concerning the mining of the harbor at Corinto, the Court would in incapable of assessing the underlying military and diplomatic considerations which resulted in the decision to place the mines without warning to innocent third party vessels. *Holtzman v. Schlesinger*, 484 F.2d 1307, 1310–11 (2d Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *DaCosta v. Laird*, 471 F.2d 1146, 1155–56 (2d Cir.1973).

Furthermore, it cannot be said that the Court, in adjudicating this case, could remain within the traditional realm of the judiciary. As the Supreme Court stated in *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948):

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex and involve large elements of proph-

ecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Id.* at 111, 68 S.Ct. at 436 (citations omitted).

Plaintiffs disingenuously assert that if the Court renders an after-the-fact determination of whether the CIA and the President exercised due care, but refrains from directly enjoining U.S. policy decisions, there will be no judicial monitoring, control or management of U.S. foreign policy towards Nicaragua, but rather, the mere exercise of powers traditionally reserved to the judiciary. To the contrary, adjudication under the FTCA or SIAA of the claims of liability plaintiffs assert would force the Court to resolve sensitive issues involving the foreign policy conduct of executive branch officials. The occurrence of such an inquiry after the completion of the covert operations in no way minimizes the danger of intrusion into the province of the Executive Branch. For the judiciary to monitor the conduct of covert military operations, whether before or after their occurrence, would be an exercise of nonjudicial discretion which *Baker* counsels the courts to avoid. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); *Korean Air Lines*, 597 F.Supp. at 616. Such scrutiny by the judicial branch would also fail to accord appropriate respect to a coordinate branch of the Government. *Id. See also Sanchez-Espinoza*, 568 F.Supp. at 600. To avoid becoming embroiled in sensitive foreign policy matters such as this one, the Court declines to interpose its own will above the will of the President or the Congress.[2]

---

2. In *Pauling v. McNamara*, 331 F.2d 796 (D.C. Cir.1963), *cert. denied*, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964), a suit which sought to enjoin nuclear testing, then Circuit Judge Warren E. Burger eloquently stated:

> That appellants now resort to the courts on a vague and disoriented theory that judicial power can supply a quick and pervasive remedy for one of mankind's great problems is no reason why we as judges should regard ourselves as some kind of Guardian Elders or-

Another concern mentioned in the *Baker* opinion, the potentiality of embarrassment from multifarious pronouncements by various departments on one question, is also seriously implicated in this case. As the news articles submitted with the plaintiffs' affidavit point out, the White House, the CIA and the State Department all publicly denied that the Government was directly involved in the mining. An inquiry by this Court into these matters, which might result in proving that the prior declarations were erroneous, could indeed be embarrassing to the Government. *See Sanchez-Espinoza*, 568 F.Supp. at 600. The Court has no choice but to heed the warning of the D.C. Circuit Court of Appeals in *Sanchez-Espinoza* concerning the acute "danger of foreign citizens using the courts in situations such as this to obstruct the foreign policy of our government...." 770 F.2d at 209 (Scalia, J.).

### CONCLUSION

In sum, the Court concludes that the plaintiffs' complaint raises a nonjusticiable political question. Thus, it is unnecessary to consider the other grounds raised by the Government in support of its motion to dismiss. Accordingly, the Government's motion is granted and plaintiffs' complaint is dismissed.

So ordered.

dained to review the political judgments of elected representatives of the people. In framing policies relating to the great issues of national defense and security, the people are and must be, in a sense, at the mercy of their elected representatives. But the basic and important corollary is that the people may remove their elected representatives as they cannot dismiss United States Judges. This elementary fact about the nature of our system, which seems to have escaped notice occasionally must make manifest to judges that we are neither gods nor godlike, but judicial officers with narrow and limited authority. Our entire System of Government would suffer incalculable mischief should judges attempt to interpose the judicial will above that of the Congress and President, even were we so bold as to assume that we can make a better decision on such issues.
331 F.2d at 799.