Justice Scalia,
with whom Justice Souter and Justice Ginsburg join as to Part I,
dissenting.
The Federal Communications Commission (FCC or Commission) has once again attempted to concoct “a whole new regime of regulation (or of free-market competition)” under the guise of statutory construction. MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U. S. 218, 234 (1994). Actually, in these cases, it might be more accurate to say the Commission has attempted to establish a whole new regime of non-regulation, which will make for more or less free-market competition, depending upon whose experts are believed. The important fact, however, is that the Commission has chosen to achieve this through an implausible reading of the statute, and has thus exceeded the authority given it by Congress.
I
The first sentence of the FCC ruling under review reads as follows: “Cable modem service provides high-speed access to the Internet, as well as many applications or functions that can be used with that access, over cable system facilities.” In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, 17 FCC Red. 4798, 4799, ¶ 1 (2002) (hereinafter Declaratory Ruling) (emphasis added; footnote omitted). Does this mean that cable companies “offer” high-speed access to the Internet? Surprisingly not, if the Commission and the Court are to be believed.
It happens that cable-modem service is popular precisely because of the high-speed access it provides, and that, once connected with the Internet, cable-modem subscribers often use Internet applications and functions from providers other than the cable company. Nevertheless, for purposes of clas *1006 sifying what the cable company does, the Commission (with the Court’s approval) puts all the emphasis on the rest of the package (the additional “applications or functions”). It does so by claiming that the cable company does not “offe[r]” its customers high-speed Internet access because it offers that access only in conjunction with particular applications and functions, rather than “separately],” as a “stand-alone offering.” Id., at 4802, ¶ 7, 4823, ¶ 40.
The focus on the term “offer” appropriately derives from the statutory definitions at issue in these eases. Under the Telecommunications Act of 1996, 110 Stat. 59, “ ‘information service’” involves the capacity to generate, store, interact with, or otherwise manipulate “information via telecommunications.” 47 U. S. C. § 153(20). In turn, “ ‘telecommunications’” is defined as “the transmission, between or among points specified by the user, of information of the user’s choosing, without change in the form or content of the information as sent and received.” §153(43). Finally, “‘telecommunications service’ ” is defined as “the offering of telecommunications for a fee directly to the public ... regardless of the facilities used.” §153(46). The question here is whether cable-modem-service providers “offe[r]... telecommunications for a fee directly to the public.” If so, they are subject to Title II regulation as common carriers, like their chief competitors who provide Internet access through other technologies.
The Court concludes that the word “offer” is ambiguous in the sense that it has “‘alternative dictionary definitions’” that might be relevant. Ante, at 989 (quoting National Railroad Passenger Corporation v. Boston & Maine Corp., 503 U. S. 407, 418 (1992)). It seems to me, however, that the analytic problem pertains not really to the meaning of “offer,” but to the identity of what is offered. The relevant question is whether the individual components in a package being offered still possess sufficient identity to be described as separate objects of the offer, or whether they have been *1007 so changed by their combination with the other components that it is no longer reasonable to describe them in that way.
Thus, I agree (to adapt the Court’s example, ante, at 990) that it would be odd to say that a car dealer is in the business of selling steel or carpets because the cars he sells include both steel frames and carpeting. Nor does the water company sell hydrogen, nor the pet store water (though dogs and cats are largely water at the molecular level). But what is sometimes true is not, as the Court seems to assume, always true. There are instances in which it is ridiculous to deny that one part of a joint offering is being offered merely because it is not offered on a “ ‘stand-alone’ ” basis, ante, at 989.
If, for example, I call up a pizzeria and ask whether they offer delivery, both common sense and common “usage,” ante, at 990, would prevent them from answering: “No, we do not offer delivery — but if you order a pizza from us, we’ll bake it for you and then bring it to your house.” The logical response to this would be something on the order of, “so, you do offer delivery.” But our pizza-man may continue to deny the obvious and explain, paraphrasing the FCC and the Court: “No, even though we bring the pizza to your house, we are not actually ‘offering’ you delivery, because the delivery that we provide to our end users is ‘part and parcel’ of our pizzeria-pizza-at-home service and is ‘integral to its other capabilities.’” Cf. Declaratory Ruling 4823, ¶39; ante, at 988, 997-998.[1] Any reasonable customer would conclude at that point that his interlocutor was either crazy or following some too-clever-by-half legal advice.
In short, for the inputs of a finished service to qualify as the objects of an “offer” (as that term is reasonably understood), it is perhaps a sufficient, but surely not a necessary, condition that the seller offer separately “each discrete input *1008 that is necessary to providing ... a finished service,” ante, at 990. The pet store may have a policy of selling puppies only with leashes, but any customer will say that it does offer puppies — because a leashed puppy is still a puppy, even though it is not offered on a “stand-alone” basis.
Despite the Court’s mighty labors to prove otherwise, ante, at 989-1000, the telecommunications component of cable-modem service retains such ample independent identity that it must be regarded as being on offer — especially when seen from the perspective of the consumer or the end user, which the Court purports to find determinative, ante, at 990, 993, 998, 1000. The Commission’s ruling began by noting that cable-modem service provides both “high-speed access to the Internet” and other “applications and functions,” Declaratory Ruling 4799, ¶ 1, because that is exactly how any reasonable consumer would perceive it: as consisting of two separate things.
The consumer’s view of the matter is best assessed by asking what other products cable-modem service substitutes for in the marketplace. Broadband Internet service provided by cable companies is one of the three most common forms of Internet service, the other two being dial-up access and broadband Digital Subscriber Line (DSL) service. Ante, at 974-975. In each of the other two, the physical transmission pathway to the Internet is sold — indeed, is legally required to be sold — separately from the Internet functionality. With dial-up access, the physical pathway comes from the telephone company, and the Internet service provider (ISP) provides the functionality.
“In the case of Internet access, the end user utilizes two different and distinct services. One is the transmission pathway, a telecommunications service that the end user purchases from the telephone company. The second is the Internet access service, which is an enhanced service provided by an ISP.... Th[e] functions [provided by the ISP] are separate from the transmission pathway *1009 over which that data travels. The pathway is a regulated telecommunications service; the enhanced service offered over it is not.” FCC, Office of Plans and Policy, J. Oxman, The FCC and the Unregulation of the Internet, p. 13 (Working Paper No. 31, July 1999), available at http://www.fcc.gov/Bureaus/OPP/working_papers/ oppwp31.pdf (as visited June 24, 2005, and available in Clerk of Court’s case file).[2]
As the Court acknowledges, ante, at 1000, DSL service has been similar to dial-up service in the respect that the physical connection to the Internet must be offered separately from Internet functionality.[3] Thus, customers shopping for dial-up or DSL service will not be able to use the Internet unless they get both someone to provide them with a physical connection and someone to provide them with applications and functions such as e-mail and Web access. It is therefore inevitable that customers will regard the competing cable-modem service as giving them both computing functionality and the physical pipe by which that functionality comes to their computer — both the pizza and the delivery service that nondelivery pizzerias require to be purchased from the cab company.[4]
*1010 Since the delivery service provided by cable (the broadband connection between the customer’s computer and the cable company’s computer-processing facilities) is downstream from the computer-processing facilities, there is no question that it merely serves as a conduit for the information services that have already been “assembled” by the cable company in its capacity as ISP. This is relevant because of the statutory distinction between an “information service” and “telecommunications.” The former involves the capability of getting, processing, and manipulating information. §158(20). The latter, by contrast, involves no “change in the form or content of the information as sent and received.” §153(43). When cable-company-assembled information enters the cable for delivery to the subscriber, the information service is already complete. The information has been (as the statute requires) generated, acquired, stored, transformed, processed, retrieved, utilized, or made available. All that remains is for the information in its final, unaltered form, to be delivered (via telecommunications) to the subscriber.
This reveals the insubstantiality of the fear invoked by both the Commission and the Court: the fear of what will happen to ISPs that do not provide the physical pathway to Internet access, yet still use telecommunications to acquire the pieces necessary to assemble the information that they pass back to their customers. According to this reductio, ante, at 993-995, if cable-modem-service providers are deemed to provide “telecommunications service,” then so must all ISPs because they all “use” telecommunications in providing Internet functionality (by connecting to other *1011 parts of the Internet, including Internet backbone providers, for example). In terms of the pizzeria analogy, this is equivalent to saying that, if the pizzeria “offers” delivery, all restaurants “offer” delivery, because the ingredients of the food they serve their customers have come from other places; no matter how their customers get the food (whether by eating it at the restaurant, or by coming to pick it up themselves), they still consume a product for which delivery was a necessary “input.” This is nonsense. Concluding that delivery of the finished pizza constitutes an “offer” of delivery does not require the conclusion that the serving of prepared food includes an “offer” of delivery. And that analogy does not even do the point justice, since “ ‘telecommunications service’ ” is defined as “the offering of telecommunications for a fee directly to the public. ” § 153(46) (emphasis added). The ISPs’ use of telecommunications in their processing of information is not offered directly to the public.
The “regulatory history” on which the Court depends so much, ante, at 992-997, provides another reason why common-carrier regulation of all ISPs is not a worry. Under its Computer Inquiry rules, which foreshadowed the definitions of “information” and “telecommunications” services, ante, at 976-977, the Commission forbore from regulating as common carriers “value-added networks” — non-facilities-based providers who leased basic services from common carriers and bundled them with enhanced services; it said that they, unlike facilities-based providers, would be deemed to provide only enhanced services, ante, at 993-994.[5] That *1012 same result can be achieved today under the Commission’s statutory authority to forbear from imposing most Title II regulations. § 160. In fact, the statutory criteria for forbearance — which include what is "just and reasonable,” “necessary for the protection of consumers,” and “consistent with the public interest,” §§ 160(a)(1), (2), (3) — correspond well with the kinds of policy reasons the Commission has invoked to justify its peculiar construction of “telecommunications service” to exclude cable-modem service.
The Court also puts great stock in its conclusion that cable-modem subscribers cannot avoid using information services provided by the cable company in its ISP capacity, even when they only click-through to other ISPs. Ante, at 998-1000. For, even if a cable-modem subscriber uses e-mail from another ISP, designates some page not provided by the cable company as his home page, and takes advantage of none of the other standard applications and functions provided by the cable company, he will still be using the cable company’s Domain Name System (DNS) server and, when he goes to popular Web pages, perhaps versions of them that are stored in the cable company’s cache. This argument suffers from at least two problems. First, in the context of telephone services, the Court recognizes a de minimis exception to contamination of a telecommunications service by an information service. Ante, at 997-998. A similar exception would seem to apply to the functions in question here. DNS, in particular, is scarcely more than routing informa *1013 tion, which is expressly excluded from the definition of “information service.” §153(20).[6] Second, it is apparently possible to sell a telecommunications service separately from, although in conjunction with, ISP-like services; that is precisely what happens in the DSL context, and the Commission does not contest that it could be done in the context of cable. The only impediment appears to be the Commission’s failure to require from cable companies the unbundling that it required of facilities-based providers under its Computer Inquiry.
Finally, I must note that, notwithstanding the Commission’s self-congratulatory paean to its deregulatory largesse, e. g., Brief for Federal Petitioners 29-32, it concluded the Declaratory Ruling by asking, as the Court paraphrases, “whether under its Title I jurisdiction [the Commission] should require cable companies to offer other ISPs access to their facilities on common-carrier terms.” Ante, at 979; see also Reply Brief for Federal Petitioners 9; Tr. of Oral Arg. 17. In other words, what the Commission hath given, the Commission may well take away — unless it doesn’t. This is a wonderful illustration of how an experienced agency can (with some assistance from credulous courts) turn statutory constraints into bureaucratic discretions. The main source of the Commission’s regulatory authority over common carriers is Title II, but the Commission has rendered that inapplicable in this instance by concluding that the definition of “telecommunications service” is ambiguous and does not (in *1014 its current view) apply to cable-modem service. It contemplates, however, altering that (unnecessary) outcome, not by changing the law (i e., its construction of the Title II definitions), but by reserving the right to change the facts. Under its undefined and sparingly used “ancillary” powers, the Commission might conclude that it can order cable companies to “unbundle” the telecommunications component of cable-modem service.[7] And presto, Title II will then apply to them, because they will finally be “offering” telecommunications service! Of course, the Commission will still have the statutory power to forbear from regulating them under § 160 (which it has already tentatively concluded it would do, Declaratory Ruling 4847-4848, ¶¶ 94-95). Such Mobius-strip reasoning mocks the principle that the statute constrains the agency in any meaningful way.
After all is said and done, after all the regulatory cant has been translated, and the smoke of agency expertise blown away, it remains perfectly clear that someone who sells cable-modem service is “offering” telecommunications. For that simple reason set forth in the statute, I would affirm the Court of Appeals.
II
In Part III-B of its opinion, the Court continues the administrative-law improvisation project it began four years ago in United States v. Mead Corp., 583 U. S. 218 (2001). To the extent it set forth a comprehensible rule,[8] Mead drasti *1015 cally limited the categories of agency action that would qualify for deference under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). For example, the position taken by an agency before the Supreme Court, with full approval of the agency head, would not qualify. Rather, some unspecified degree of formal process was required — or was at least the only safe harbor. See Mead, supra, at 245-246 (Scalia, J., dissenting).[9]
This meant that many more issues appropriate for agency determination would reach the courts without benefit of an agency position entitled to Chevron deference, requiring the courts to rule on these issues de novo.[10] As I pointed out in *1016 dissent, this in turn meant (under the law as it was understood until today)[11] that many statutory ambiguities that might be resolved in varying fashions by successive agency administrations would be resolved finally, conclusively, and forever, by federal judges — producing an “ossification of large portions of our statutory law,” 583 U. S., at 247. The Court today moves to solve this problem of its own creation by inventing yet another breathtaking novelty: judicial decisions subject to reversal by executive officers.
Imagine the following sequence of events: FCC action is challenged as ultra vires under the governing statute; the litigation reaches all the way to the Supreme Court of the United States. The Solicitor General sets forth the FCC’s official position (approved by the Commission) regarding interpretation of the statute. Applying Mead, however, the Court denies the agency position Chevron deference, finds that the best interpretation of the statute contradicts the agency’s position, and holds the challenged agency action unlawful. The agency promptly conducts a rulemaking, and *1017 adopts a rule that comports with its earlier position — in effect disagreeing with the Supreme Court concerning the best interpretation of the statute. According to today’s opinion, the agency is thereupon free to take the action that the Supreme Court found unlawful.
This is not only bizarre. It is probably unconstitutional. As we held in Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U. S. 103 (1948), Article III courts do not sit to render decisions that can be reversed or ignored by executive officers. In that case, the Court of Appeals had determined it had jurisdiction to review an order of the Civil Aeronautics Board awarding an overseas air route. By statute such orders were subject to Presidential approval and the order in question had in fact been approved by the President. Id., at 110-111. In order to avoid any conflict with the President’s foreign-affairs powers, the Court of Appeals concluded that it would review the board’s action “as a regulatory agent of Congress,” and the results of that review would remain subject to approval or disapproval by the President. Id., at 112-113. As I noted in my Mead dissent, 533 U. S., at 248, the Court bristled at the suggestion: “Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government.” Waterman, supra, at 113. That is what today’s decision effectively allows. Even when the agency itself is party to the case in which the Court construes a statute, the agency will be able to disregard that construction and seek Chevron deference for its contrary construction the next time around.[12]
*1018 Of course, like Mead itself, today’s novelty in belated remediation of Mead creates many uncertainties to bedevil the lower courts. A court’s interpretation is conclusive, the Court says, only if it holds that interpretation to be “the only permissible reading of the statute,” and not if it merely holds it to be “the best reading.” Ante, at 984. Does this mean that in future statutory-construction cases involving agency-administered statutes courts must specify (presumably in dictum) which of the two they are holding? And what of the many cases decided in the past, before this dictum’s requirement was established? Apparently, silence on the point means that the court’s decision is subject to agency reversal:'“Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency’s, the court must hold that the statute unambiguously requires the court’s construction.”[13] Ante, at 985. (I have not made, and as far as I know the Court has not made, any calculation of how many hundreds of past statutory decisions are now agency-reversible because of failure to include an “unambiguous” finding. I suspect the number is very large.) How much extra work will it entail for each court confronted with an agency-administered statute to determine whether it has reached, not only the right (“best”) result, but “the only permissible” result? Is the standard for “unambiguous” under the Court’s new agency-reversal rule the same as the standard for “unambiguous” under step one of Chevron? (If so, *1019 of course, every case that reaches step two of Chevron will be agency-reversible.) Does the “unambiguous” dictum produce stare decisis effect even when a court is affirming, rather than reversing, agency action — so that in the future the agency must adhere to that affirmed interpretation? If so, does the victorious agency have the right to appeal a Court of Appeals judgment in its favor, on the ground that the text in question is in fact not (as the Court of Appeals held) unambiguous, so the agency should be able to change its view in the future?
It is indeed a wonderful new world that the Court creates, one full of promise for administrative-law professors in need of tenure articles and, of course, for litigators.[14] I would adhere to what has been the rule in the past: When a court interprets a statute without Chevron deference to agency views, its interpretation (whether or not asserted to rest upon an unambiguous text) is the law. I might add that it is a great mystery why any of this is relevant here. Whatever the stare decisis effect of AT&T Corp. v. Portland, 216 F. 3d 871 (CA9 2000), in the Ninth Circuit, it surely does not govern this Court’s decision. And — despite the Court’s peculiar, self-abnegating suggestion to the contrary, ante, at 985-986 — the Ninth Circuit would already be obliged to *1020 abandon Portland’s holding in the face of this Court’s decision that the Commission’s construction of “telecommunications service” is entitled to deference and is reasonable. It is a sadness that the Court should go so far out of its way to make bad law.
I respectfully dissent.

 The myth that the pizzeria does not offer delivery becomes even more difficult to maintain when the pizzeria advertises quick delivery as one of its advantages over competitors. That, of course, is the case with cable broadband.

 See also In re Federal-State Joint Board on Universal Service, 13 FCC Red. 11501, 11571-11572, ¶ 145 (1998) (end users “obtain telecommunications service from local exchange carriers, and then use information services provided by their Internet service provider and [Web site operators] in order to access [the Web]”).

 In the DSL context, the physical connection is generally resold to the consumer by an ISP that has taken advantage of the telephone company’s offer. The consumer knows very well, however, that the physical connection is a necessary component for Internet access which, just as in the dial-up context, is not provided by the ISP.

 The Court contends that this analogy is inapposite because one need not have a pizza delivered, ante, at 992, whereas one must purchase the cable connection in order to use cable’s ISP functions. But the ISP functions provided by the cable company can be used without cable delivery— by accessing them from an Internet connection other than cable. The *1010 merger of the physical connection and Internet functions in cable’s offerings has nothing to do with the ‘“inextricably intertwined,”’ ante, at 978, nature of the two (like a car and its carpet), but is an artificial product of the cable company’s marketing decision not to offer the two separately, so that the Commission could (by the Declaratory Ruling under review here) exempt it from common-carrier status.

 The Commission says forbearance cannot explain why value-added networks were not regulated as basic-service providers because it was not given the power to forbear until 1996. Reply Brief for Federal Petitioners 3-4, n. 1. It is true that when the Commission ruled on value-added networks, the statute did not explicitly provide for forbearance — any more than it provided for the categories of basic and enhanced services that the Computer Inquiry rules established, and through which the forbearance was applied. The D. C. Circuit, however, had long since recognized the *1012 Commission’s discretionary power to “forbear from Title II regulation.” Computer and Communications Industry Assn. v. FCC, 693 F. 2d 198, 212 (1982).
The Commission also says its Computer Inquiry rules should not apply to cable because they were developed in the context of telephone lines. Brief for Federal Petitioners 35-36; see also ante, at 996. But to the extent that the statute imported the Computer Inquiry approach, there is no basis for applying it differently to cable than to telephone lines, since the definition of “telecommunications service” applies “regardless of the facilities used.” 47 U. S. C. § 153(46).

 The Court says that invoking this explicit exception from the definition of information services, which applies only to the “management, control, or operation of a telecommunications system or the management of a telecommunications service,” §153(20), begs the question whether cable-modem service includes a telecommunications service, ante, at 999, n. 3. I think not, and cite the exception only to demonstrate that the incidental functions do not prevent cable from including a telecommunications service if it otherwise qualifies. It is rather the Court that begs the question, saying that the exception cannot apply because cable is not a telecommunications service.

 Under the Commission's assumption that cable-modem-service providers are not providing “telecommunications services,” there is reason to doubt whether it can use its Title I powers to impose common-carrier-like requirements, since § 153(44) specifically provides that a “telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services” (emphasis added), and “this chapter” includes Titles I and II.

 For a description of the confusion Mead has produced, see Vermeule, Mead, in the Trenches, 71 Geo. Wash. L. Rev. 347, 361 (2003) (concluding that “the Court has inadvertently sent the lower courts stumbling into a no-man’s land”); Bressman, How Mead Has Muddled Judicial Review of *1015 Agency Action, 58 Vand. L. Rev. 1443, 1475 (2005) (“Mead has muddled judicial review of agency action”).

 Justice Breyer attempts to clarify Mead by repeating its formulations that the Court has “sometimes found reasons” to give Chevron deference in a (still-unspecified) “variety of ways” or because of a (still-unspecified) "variety of indicators,” ante, at 1004 (concurring opinion) (internal quotation marks and emphasis omitted). He also notes that deference is sometimes inappropriate for reasons unrelated to the agency’s process. Surprising those who thought the Court’s decision not to defer to the agency in General Dynamics Land Systems, Inc. v. Cline, 540 U. S. 581 (2004), depended on its conclusion that there was “no serious question . . . about purely textual ambiguity” in the statute, id., at 600, Justice Breyer seemingly attributes that decision to a still-underdeveloped exception to Chevron deference — one for “unusually basic legal question[s],” ante, at 1004. The Court today (thankfully) does not follow this approach: It bases its decision on what it sees as statutory ambiguity, ante, at 996-997, without asking whether the classification of cable-modem service is an “unusually basic legal question.”

 It is true that, even under the broad basis for deference that I propose (viz., any agency position that plainly has the approval of the agency head, see United States v. Mead Corp., 533 U. S. 218, 256-257 (2001) (Scalia, J., dissenting)), some interpretive matters will be decided de novo, without deference to agency views. This would be a rare occurrence, however, at the Supreme Court level — at least with respect to matters of any significance to the agency. Seeking to achieve 100% agency control of ambiguous provisions through the complicated method the Court proposes is not worth the incremental benefit.

 The Court’s unanimous holding in Neal v. United States, 516 U. S. 284 (1996), plainly rejected the notion that any form of deference could cause the Court to revisit a prior statutory-construction holding: “Once we have determined a statute’s meaning, we adhere to our ruling under the doctrine of stare decisis, and we assess an agency’s later interpretation of the statute against that settled law.” Id., at 295. The Court attempts to reinterpret this plain language by dissecting the cases Neal cited, noting that they referred to previous determinations of “ ‘a statute’s clear meaning.’ ” Lechmere, Inc. v. NLRB, 502 U. S. 527, 537 (1992) (quoting Maislin Industries, U. S., Inc. v. Primary Steel, Inc., 497 U. S. 116, 131 (1990)). But those cases reveal that today’s focus on the term “clear” is revisionist. The oldest case in the chain using that word, Maislin Industries, did not rely on a prior decision that held the statute to be clear, but on a run-of-the-mill statutory interpretation contained in a 1908 decision. Id., at 130-131. When Maislin Industries referred to the Court’s prior determination of “a statute’s clear meaning,” it was referring to the fact that the prior decision had made the statute clear, and was not conducting a retrospective inquiry into whether the prior decision had declared the statute itself to be clear on its own terms.

 The Court contends that no reversal of judicial holdings is involved, because “a court’s opinion as to the best reading of an ambiguous statute ... is not authoritative,” ante, at 983. That fails to appreciate the difference between a de novo construction of a statute and a decision whether to defer to an agency’s position, which does not even “purport to give the statute a judicial interpretation.” Mead, supra, at 248 (SCALIA, *1018 J., dissenting). Once a court has decided-upon its de novo construction of the statute, there no longer is a “different construction” that is “consistent with the court’s holding,” ante, at 983, and available for adoption by the agency.

 Suggestive of the same chaotic undermining of all prior judicial decisions that do not explicitly renounce ambiguity is the Court’s explanation of why agency departure from a prior judicial decision does not amount to overruling: “[T]he agency may, consistent with the court’s holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of [ambiguous] statutes [it is charged with administering].” Ibid.

 Further deossification may already be on the way, as the Court has hinted that an agency construction unworthy of Chevron deference may be able to trump one of our statutory-construction holdings. In Edelman v. Lynchburg College, 585 U. S. 106, 114 (2002), the Court found “no need to resolve any question of deference” because the Equal Employment Opportunity Commission’s rule was “the position we would adopt even if... we were interpreting the statute from scratch.” It nevertheless refused to say whether the agency’s position was “the only one permissible.” Id., at 114, n. 8 (internal quotation marks omitted). Justice O’Connok appropriately “doubt[ed] that it is possible to reserve” the question whether a regulation is entitled to Chevron deference “while simultaneously maintaining... that the agency is free to change its interpretation” in the future. 535 U. S., at 122 (opinion concurring in judgment). In response, the Court cryptically said only that “not all deference is deference under Chevron.” Id., at 114, n. 8.